[Cite as *State v. Dye*, 2016-Ohio-986.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  13-15-35

      v.

MICHAEL L. DYE,                     O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 15-CR-0049

Judgment Affirmed

Date of Decision:  March 14, 2016

APPEARANCES:

    *James W. Fruth* for Appellant

    *Stephanie J. Reed* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant Michael L. Dye ("Dye") brings this appeal from the September 18, 2015 judgment of the Seneca County Common Pleas Court sentencing Dye to 42 months in prison after Dye was found guilty in a jury trial of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree.

*Relevant Facts and Procedural History*

{¶2} On March 25, 2015, Dye was indicted for Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree, and Importuning in violation of R.C. 2907.07(A), a felony of the third degree. Both crimes were allegedly perpetrated on March 14, 2015, against the same 11-year-old victim, K.H. Dye pled not guilty to the charges.

{¶3} On July 30, 2015, the case proceeded to a jury trial. At trial, the State called three witnesses beginning with Officer Drew Westenbarger of the Tiffin Police Department. Officer Westenbarger testified that on March 15, 2015, he was called to investigate a complaint that Dye had inappropriately touched K.H. Officer Westenbarger testified that he learned that K.H. was not related to Dye; however, Dye was a friend of K.H.'s family and K.H. even called him "Grandpa." (Tr. at 108). Officer Westenbarger testified that he went and spoke with K.H. at her residence regarding the incident and then went and spoke with Dye at his

residence. Officer Westenbarger testified that after he spoke with Dye he photographed Dye's bedroom where the incident had allegedly taken place the night prior. Those photographs were introduced into evidence. Officer Westenbarger testified that he then turned the case over to the detectives.

{¶4} The State next called K.H. who testified that she was 11 years old at the time of trial and she was in sixth grade in school. K.H. indicated that she knew Dye because he had dated K.H.'s grandmother. K.H. testified that she called Dye "Frog" or "Papa Frog." (Tr. at 122). K.H. testified that Dye lived across the street from her grandmother and that she had been to Dye's residence on numerous occasions previously. K.H. testified that her brother and sister would also go to Dye's residence with her. K.H. testified that it was rare that just she and Dye were alone at his residence, but she indicated it had happened before. (*Id*. at 124-125).

{¶5} K.H. testified that on March 14, 2015, which was a Saturday, Dye came and took her to his residence. K.H. indicated that she was going to spend the night at Dye's residence, and that she had spent the night there previously. K.H. testified that when she spent the night at Dye's residence in the past she would sleep in the bed in Dye's bedroom and Dye would usually sleep in a recliner that was also in the bedroom. K.H. testified that a man named "Dave" stayed at Dye's residence as well, but he usually slept on the living room couch. (Tr. at 134-135).

{**¶6**} K.H. testified that after Dye picked her up they went to Dollar Tree and bought candy. K.H. testified that they eventually went back to Dye's residence and played "dice." (Tr. at 130). Afterward, K.H. indicated she and Dye went upstairs to Dye's bedroom and watched a movie. K.H. testified that after the movie was over she asked Dye to give her a back massage. K.H. testified that Dye had given her back massages on prior occasions but on those prior occasions nothing of a sexual nature occurred.

{**¶7**} K.H. testified that before Dye began the back massage Dye "told [her] to touch his dick" and she said no. (Tr. at 137). K.H. testified that Dye repeated it a couple of times and she refused. K.H. testified that Dye then got onto the bed and got on top of her, straddling her, while she was on her stomach. K.H. testified that she was not able to move her hands and that Dye pulled down her pants and underwear. K.H. testified that Dye then "touched [her] privacy between [her] legs." (*Id*. at 139). K.H. testified that Dye used "[h]is whole hand and he was rubbing it." (*Id*. at 140). K.H. testified that Dye moved his hand "in a circle" and that he did it "for about five minutes." (*Id*.)

{**¶8**} K.H. also testified that Dye unstrapped her bra and "touched [her] boobs." (Tr. at 141). K.H. testified that Dye told her not to tell anyone, whispering it in her ear. K.H. continued, testifying, "After that, after he had touched my private area and my breasts, he had got off and I flipped over and

pulled my pants up and he was bouncing on top of me like he was trying to do something." (*Id*. at 143). K.H. testified that Dye "tried to have sex with [her]" and that Dye's "privacy was sticking out but he still had his pants on." (*Id*. at 143-144). K.H. testified that Dye was "bouncing up and down" on her when they were both clothed, for "[f]ive minutes, [or] maybe less." (*Id*. at 144-145). K.H. testified that she eventually said "help" and was about to scream "help" but Dye stopped, got off of her, and went downstairs. (*Id*. at 145-146).

{¶9} K.H. testified that she then tried to call her mother while Dye was out of the room but she could not get the phone to work. K.H. testified that she then got under the blankets on the bed and went to sleep. K.H. testified that the next morning Dye took her to McDonalds and then took her home. K.H. testified that she told her parents what happened when she got home, and that the police were then called.

{¶10} On cross-examination K.H. testified that she did specifically ask Dye for a back massage. She also testified that she was ticklish and that she wiggled around some when she was tickled. K.H. testified that she wore loose-fitting pants on the night of the incident; however, K.H. maintained that Dye pulled her pants and underwear down rather than them falling as Dye claimed.

{¶11} The State next called Detective Lieutenant Mark Marquis of the Tiffin Police Department. Detective Marquis testified that he was assigned to

investigate K.H.'s case after he received Officer Westenbarger's initial report. Detective Marquis testified that he interviewed K.H. and that he also interviewed Dye. Detective Marquis's interview with Dye was recorded and played for the jury.

{¶12} In the interview, Dye corroborated K.H.'s story up to the point of the back massage. Dye indicated that K.H. did request a back massage after they watched a movie and that he offered to do so. Dye stated, however, that K.H. unstrapped her own bra so that he could rub her back. Dye demonstrated in the interview how he straddled K.H. to give her the massage.

{¶13} In the interview Dye initially contended that he never touched anywhere near K.H.'s private areas. However, later in the interview, Dye stated that his hand may have "slipped" when K.H. wiggled as Dye tickled her and Dye lost his balance. Even later in the interview, Dye specifically stated that his hand slid between K.H.'s legs, and that his hand was on K.H.'s vagina. Dye denied that there was any kind of digital penetration and he also specifically denied ever requesting K.H. to touch his penis, stating, "I don't remember that." (State's Ex. 8).

{¶14} At the conclusion of the interview, Dye wrote a statement of the events, which was also introduced into evidence along with the interview recording. According to Dye's statement,

> **[K.H.] was on her stomach, I raised the back of her shirt, she raised the front, she unsnapped her bra, I massaged her shoulders and back and tickled her in the neck, arm pits and sides, with her moving around, I lost my balance, I was strattled** [sic] **over her lower leg and knee area, when I lost my balance she was moving her butt up, her pants came down. When I moved my left leg to regain balance my hand accidentally went between her legs and slid over her private areas and if my hands ever touched her chest, it was by accident from her moving, or loss of balance or both. I would do nothing to purposely hurt her and I do not remember her being on her back and I do not remember asking her to touch me.**

(State's Ex. 6).

{¶15} When the recording of the interview was finished playing, Detective Marquis's testimony resumed and his testimony continued into the second day of trial. On the second day of trial, Detective Marquis was cross-examined about, *inter alia*, his training in interviewing techniques. When Detective Marquis's testimony was concluded, the State entered its exhibits into evidence and rested its case. Dye elected not to call any witnesses and he rested his case.

{¶16} The jury ultimately found Dye guilty of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree, and not guilty of the Importuning charge. The trial court accepted the verdicts and set the matter for sentencing.

{¶17} On September 18, 2015, the case proceeded to sentencing. At sentencing Dye's counsel requested that Dye be placed on community control. The State requested a 54 month prison sentence. After considering the record and

the appropriate statutory factors, the trial court sentenced Dye to serve 42 months in prison. A judgment entry memorializing Dye's sentence was filed that same day, September 18, 2015. It is from this judgment that Dye appeals, asserting the following assignment of error for our review.

**ASSIGNMENT OF ERROR**
**APPELLANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AND, AS A RESULT, WAS ALSO DENIED HIS SIXTH AMENDMENT RIGHTS, THEREBY DENYING HIM OF A FAIR TRIAL.**

{¶18} In his assignment of error, Dye argues that he received ineffective assistance of trial counsel. Specifically, he contends that his trial counsel failed to object to numerous leading questions, that his attorney failed to present exculpatory evidence, that his attorney failed to properly impeach K.H., that trial counsel failed to object to hearsay during Detective Marquis's testimony, and that trial counsel's cross-examination of Detective Marquis was not thorough enough.

{¶19} In *State v. Bradley,* 42 Ohio St.3d 136 (1989), the Supreme Court of Ohio adopted the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, (1984), for ineffective assistance of counsel. Under this test, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Bradley* at paragraph two of the syllabus. In order to show prejudice, "the

defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶20} In this case Dye first argues that his trial counsel was ineffective for failing to object to what Dye claims were a number of leading questions used by the prosecutor when questioning K.H. at trial.[1] To support his argument, Dye summarily cites the pages containing the *entire* direct-examination of K.H. and complains that there were a number of leading questions prompting K.H. to respond with either "yes" or "no" within those pages. However, Dye does not cite this court to *a single specific instance* he claims was error or that was prejudicial.

{¶21} Notwithstanding Dye's lack of specificity, a review of the transcript reveals that the prosecutor regularly asked non-leading questions to K.H. such as, "Can you tell us what happened on that day?" (Tr. at 127). "[W]hat happened then?" (*Id*. at 128). "What happened after the movie was over?" (*Id*. at 136). At times K.H. did not elaborate on her responses to the prosecutor's questions, giving only brief answers, so the prosecutor would repeatedly follow-up to ask what happened next.

{¶22} Nevertheless, to the extent that any leading questions were used by the State and were not objected to, we would note that it is wholly within the trial

---

[1] Dye does concede that his counsel did object once to the prosecutor's questioning for leading K.H., and that the objection was sustained.

court's discretion to allow leading questions on direct examination and therefore courts have typically found that any failure to object to leading questions does not constitute ineffective assistance of counsel. *State v. Johnson*, 10th Dist. Franklin No. 13AP-997, 2015-Ohio-3248, ¶ 121, citing *State v. Jefferson,* 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377, ¶ 9, citing *State v. Jackson,* 92 Ohio St.3d 436, 449 (2001). Furthermore, electing not to object to the use of leading questions, particularly when a child-victim is being questioned, could certainly fall within the ambit of trial strategy. *See State v. Stober*, 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, ¶ 144 appeal not allowed, 140 Ohio St.3d 1438, 2014-Ohio-4160, ¶ 146 (2014). Therefore Dye's argument on this issue is not well-taken.

**{¶23}** Dye next argues that his trial counsel was ineffective for failing to "present exculpatory evidence that would have exonerated him" and for failing to "use prior inconsistent statements to impeach * * * K.H." (Appt.'s Br. at 8). Dye fails to support these claims with any citations to the record or to legal authority showing that any purported errors contained any legal merit. It is not clear what "exculpatory" evidence Dye thinks his appellate counsel should have presented or what prior inconsistencies his counsel failed to emphasize. Therefore, Dye's argument is not well-taken.

**{¶24}** Dye next contends that trial counsel failed to object to multiple instances of hearsay testimony offered by Detective Marquis. Dye lists a number

of pages of the transcript claiming that they contained instances of inadmissible hearsay without illustrating how the instances were actually hearsay or, if they were hearsay, how they were prejudicial. Notably the vast majority of the instances cited by Dye either consisted of Detective Marquis explaining how he proceeded in his own investigation or other matters not pertaining to hearsay.

{¶25} However, Dye does elaborate on one particular instance of Detective Marquis's testimony that he claims was hearsay, contending that it was the most egregious example of his trial counsel's failure to object. During Detective Marquis's testimony, Detective Marquis gave a summary of his interview with K.H., including what she had told him about the incident. Dye argues that this testimony constituted hearsay and that his trial counsel was ineffective for failing to object to it.

{¶26} We note that while this testimony did clearly constitute hearsay it was merely cumulative to the victim's testimony and thus it would be difficult for Dye to establish that it was prejudicial. Nevertheless, Dye's counsel's decision not to object to Detective Marquis's testimony regarding his interview with K.H. could have fallen within the ambit of trial strategy as the Detective's testimony actually pointed to some minor inconsistencies between K.H.'s testimony at trial and her initial interview. Detective Marquis indicated that K.H. had told him that she was initially on her back in Dye's bed rather than on her stomach as she

testified in court. In addition, K.H. also told Detective Marquis that she had been watching the movie "Kicking and Screaming" with Dye before the incident and she testified at trial that the movie was something with "Tigers" in the title. (Tr. at 176).

{¶27} Further, we note that Dye's counsel did object to some portions of Detective Marquis's narration of his interview with K.H., perhaps indicating that trial counsel *did* strategically decide to let some of Detective Marquis's narration into evidence.[2] Arguably trial counsel's decision not to object was an effective trial strategy given that Dye was acquitted on one of the two counts he was charged with, which was also a third degree felony. Therefore we cannot find that based on the record before us, Dye has demonstrated that any prejudicial error occurred by his trial counsel electing not to object to purported hearsay testimony of Detective Marquis. This argument is thus not well-taken.

{¶28} Finally, Dye contends that his trial counsel's cross-examination of Detective Marquis was too brief, covering only a handful of pages despite a lengthy direct-examination. Similar to prior arguments, Dye does not show how a targeted and limited cross-examination could possibly be error and he does not support his claims that a short cross-examination is improper with any legal

---

[2] Those objections were sustained.

authority. Therefore Dye's argument is not well-taken, and his assignment of error is overruled.

{¶29} Having found no error prejudicial to Dye in the particulars assigned, his assignment of error is overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**