[Cite as *State v. Kruse*, 2017-Ohio-5667.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 14-16-15

    v.

JEAN PAUL KRUSE,                 O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 13-CR-0124

**Judgment Affirmed**

**Date of Decision:   July 3, 2017**

APPEARANCES:

    *Elizabeth M. Mosser* **for Appellant**

    *Jocelyn K. Lowe* **for Appellee**

**ZIMMERMAN, J.**

{¶1} Defendant-Appellant, Jean Paul Kruse ("Kruse" or "Jean Paul"), brings this appeal from the judgment entry of Union County Common Pleas court convicting and sentencing him to multiple terms of life imprisonment following guilty verdicts by a jury on five counts of rape, five counts of sexual battery, four counts of gross sexual imposition and one count of intimidation of a witness in a criminal case. On appeal, Kruse asserts that the trial court abused its discretion when it denied Kruse funding for an investigator and an expert witness; that he was denied the effective assistance of counsel; that the trial court committed plain error by admitting hearsay evidence; and that his convictions for rape, sexual battery, and gross sexual imposition were against the manifest weight of the evidence. For the reasons that follow, we affirm the convictions of Kruse.

*Facts*

{¶2} Jean Paul Kruse married Emily Kruse ("Emily") in 2003 (collectively referred to as "the Kruses"). The Kruses had children from previous relationships, and one child of their own was born during their marriage. In addition to these children, during their marriage the Kruses' fostered and adopted children from various parts of the world, including Viet Nam, Haiti, Liberia, and the Congo.

{¶3} As of July, 2012, the Kruses had ten children living with them in their home in Marysville, Ohio. On July 20, 2012, one of the children living with them,

N.D., disclosed to Roy and Susie Fraker, Emily Kruse's parents, that Jean Paul had sexually abused some of the children in the Kruses' home.[1] (05/19/15 Tr. at 172-73). Specifically, N.D. stated that Jean Paul had sexually abused B.K. and S.K., adoptive children of the Kruses. Further, another child living in the home, F.K., told family members that Jean Paul had sexually abused her and corroborated that Jean Paul had sexually abused the other children.

{¶4} Criminal and children services' investigations commenced in Union County in the weeks thereafter against Jean Paul. During the course of the investigations F.K. and B.K. disclosed that Jean Paul Kruse sexually abused them. In addition to these allegations of abuse, Emily's biological daughter, M.C., alleged Jean Paul also abused her.[2]

*Procedural History*

{¶5} On July 15, 2013 the Union County, Ohio grand jury indicted Jean Paul on seventeen (17) criminal charges consisting of rape, sexual battery, gross sexual imposition ("gross sexual imposition" or "GSI"), and intimidation of an attorney, victim, or witness in a criminal case. Kruse obtained counsel on July 31, 2013, and requests for discovery and a bill of particulars were filed on that same date. On

---

[1] N.D. testified that she disclosed the sexual abuse concerns to: Emily Kruse, Betsy and Andy Fraker, Scott and Amy Holly, and Amy Connolly prior to the July 20, 2012 disclosure to Roy and Susie Fraker. (05/13/15 Tr., Vol. II. at 184-87).
[2] Ultimately, the jury found Kruse not guilty of sexual abuse involving M.C.

August 27, 2013 the State responded to Kruse's request for discovery, and supplemented its response to the request for discovery on September 17, 2013.

{¶6} On June 12, 2014 a superseding indictment was filed against Jean Paul. This new indictment contained twenty-seven (27) criminal counts, including multiple counts of rape, sexual battery, and gross sexual imposition, as well as seven counts of intimidation of a witness, and one count of tampering with evidence. However, on August 7, 2014 a third, superseding indictment was filed in this case against Kruse, consisting of thirty-five (35) counts, including multiple counts of rape, sexual battery, and gross sexual imposition, and intimidation of a witness and one count of tampering with evidence.

{¶7} On September 24, 2014 an application for appointment of a special prosecutor was filed by the State. A special prosecutor was appointed in this case on September 30, 2014.

{¶8} On January 9, 2015 Kruse filed a motion in the trial court for appropriation of funds for an investigator to assist with his defense. A hearing on the request was held on January 14, 2015, and on January 16, 2015 the court overruled Kruse's motion. However, on April 14, 2014, Kruse filed another motion for appropriation of funds for a child forensic investigator which the trial court denied in part and sustained in part. In its ruling, the trial court appropriated Kruse $1,000 for an investigator to assist with his trial preparation, but denied any funding

for the investigator to testify at trial. Interestingly, the record is unclear as to whether Kruse ever hired an investigator or used the funding provided by the trial court.

{¶9} The cases proceeded to a jury trial on May 11, 2015 and during the course of the trial the State dismissed 12 of its 35 counts. (05/18/2015 Tr. at 67-68). Upon completion of the trial, the jury found Kruse guilty on 15 of 23 counts in the indictment.[3] However, the jury was unable to reach a verdict on one count of gross sexual imposition (Count 7), but did find Kruse not guilty on the remaining 7 counts (Counts 4, 5, 6, 8, 18, 19, and 20).

{¶10} At Kruse's sentencing hearing on June 3, 2015, the trial court found that counts one (Rape), two (Sexual Battery), and three (Gross Sexual Imposition) merged, and thereafter sentenced Kruse on count one, Rape, for an indefinite term of imprisonment, with a minimum 10 years and maximum life sentence. In regards to counts nine (Rape), ten (Sexual Battery), and eleven (Gross Sexual Imposition), the trial court found that those counts merged, and thereafter sentenced Kruse on count nine, Rape, to a term of life imprisonment without parole. Regarding counts twelve (Rape), thirteen (Sexual Battery), and fourteen (Gross Sexual Imposition), the trial court also found that those counts merged, and Kruse was sentenced

---

[3] Specifically, Kruse was found guilty of renumbered counts: Count 1 – Rape; Count 2 – Sexual Battery; Count 3 – GSI; Count 9 – Rape; Count 10 – Sexual Battery; Count 11 – GSI; Count 12 – Rape; Count 13 – Sexual Battery; Count 14 – GSI; Count 15 – Rape; Count 16 – Sexual Battery; Count 17 – Witness Intimidation; Count 21 – Rape; Count 22 – Sexual Battery; and Count 23 – GSI.

thereafter on count twelve, Rape, to a term of life imprisonment without parole. In regards to counts fifteen (Rape) and sixteen (Sexual Battery), the trial court found that those counts merged, and Kruse was sentenced on count fifteen, Rape, to a term of life imprisonment without parole. On count seventeen, Intimidation, the court sentenced Kruse to a term of thirty months imprisonment. In regards to counts twenty-one (Rape) and twenty-two (Sexual Battery), the trial court found that those counts merged and Kruse was thereafter sentenced on count twenty-one, Rape, to an indefinite prison term with a minimum of ten years and a maximum of life. On count twenty-three, gross sexual imposition, the court sentenced Kruse to a fifty-four-month term of imprisonment.

{¶11} Further, the trial court ordered that the five rape sentences imposed (Counts 1, 9, 12, 15, and 21) to run consecutively with each other, and the intimidation of a witness and gross sexual imposition counts (Counts 17 and 23) to run concurrently with the five rape sentences. Thus, Kruse's rape sentences consisted of three (3) life sentences without parole (Counts 9, 12, and 15) and two (2) sentences with minimum terms of 10 years and a maximum of life (Counts 1 and 21). Additionally, the trial court ordered that Kruse be registered as a Tier III sex offender/child victim offender.

{¶12} From his convictions Kruse timely appeals, and presents the following assignments of error for our review:

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT FUNDS FOR AN INVESTIGATOR, AND LATER AN EXPERT WITNESS, CONTRARY TO LAW.**

## ASSIGNMENT OF ERROR NO. II

**APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT COMMITTED PLAIN ERROR THAT SUBSTANTIALLY PREJUDICED APPELLANT.**

## ASSIGNMENT OF ERROR NO. IV

**THE CONVICTIONS OF RAPE, SEXUAL BATTERY, AND GROSS SEXUAL IMPOSITION WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶13} On appeal, Kruse contends that the trial court abused its discretion in regards to its denial of funding for an investigator and expert witness; that he was denied the effective assistance of counsel; that the trial court committed plain error in admitting hearsay testimony; and that all the convictions of rape, sexual battery, and gross sexual imposition are against the manifest weight of the evidence. We will address each assignment of error in turn.

*First Assignment of Error*

{¶14} In his first assignment of error, Kruse contends that the trial court abused its discretion by denying Kruse funds for an investigator and expert witness.

Specifically, Kruse asserts that on January 16, 2015 the trial court improperly denied Kruse funds for an investigator, citing the lack of timeliness of the request by the defense as the reason for denial. Additionally, Kruse states that on April 28, 2015 the trial court improperly denied Kruse's subsequent funding request for the investigator to testify as an expert witness at trial. For the following reasons, we find Appellant's arguments are without merit.

*Standard of Review*

{¶15} "As a matter of due process, indigent defendants are entitled to receive the 'raw materials' and the 'basic tools of an adequate defense * * *.'" *State v. Mason,* 82 Ohio St.3d 144, 149, 1998-Ohio-370, 694 N.E. 2d 932 citing *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087 (1985) quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431 (1971). "Due process * * * does not require the government to provide expert assistance to an indigent defendant in the absence of a particularized showing of need." *Id.* at 150. A 'particularized showing of need' means "more than a mere possibility of assistance from an expert." *Id.* "Rather, a defendant must show a reasonable probability that an expert would aid in his defense, and that the denial of expert assistance would result in an unfair trial." *Id.*

{¶16} In regards to a trial court's decision to grant or deny a request for an expert witness the Ohio Supreme Court has determined:

> [I]t is appropriate for a court to consider the following factors in determining whether the provision of an expert witness is necessary:

'(1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided.'

**{¶17}** *State v. Brady,* 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 22 quoting *Mason, supra,* citing *Ake, supra.*

**{¶18}** The trial court possesses the sound discretion to grant or deny a defendant's request for an expert witness. *Id.* at ¶ 23. Therefore, a trial court's decision as to whether to provide an expert witness is reviewed under the "abuse of discretion" standard. *Id.* "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State v. Hernandez,* 3rd Dist. Hardin No. 6-16-08, 2017-Ohio-679, ¶ 7 citing *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Absent an abuse of discretion, an appellate court shall not reverse a trial court's decision. *Maag v. Maag,* 3rd Dist. Wyandot No. 16-01-16, 2002-Ohio-1401, *2.

*First Ruling on Investigator Funds*

**{¶19}** Kruse contends that trial court improperly denied him funding for an investigator by making no findings as to a particularized need, and by citing the lack of timeliness as the reason for the denial. In support, Kruse directs us to the trial

court's January 16, 2015 entry in which the trial court determined Kruse's lack of timeliness of the request as the reason for the denial.

{¶20} The trial court's January 16, 2015 Judgment Entry denying Kruse's first request for investigator funding states as follows:

> [u]pon due consideration, the Court, after stating its reasoning on the record, **ORDERED** that Defendant's Motion for Appropriation of Funds for an Investigator * * * [was] **overruled**.

(Doc. No. 127 at 1). As to the trial court's "reasoning on the record" at the hearing of January 14, 2015, the trial court stated as follows:

> I'm denying your other [investigator] motions, but I am granting the continuance. I think the information that you have is sufficient to negate the need for an investigator. I think that will create an undue delay because as soon as your investigator gets done with whatever your investigator's doing, then the Prosecutor's going to want to do the same thing and there's going to be a back and forth. * * * That's just too unproductive and too much delay. I don't think that's required.

(01/14/15 Tr. at 23).

{¶21} Even though the trial court did not use the "particularized need" language in its ruling, the trial court nonetheless conducted its analysis consistent with the factors outlined in *Brady* and *Mason* that are set forth above. Regarding the first factor in *Brady,* the trial court found that Kruse had already received sufficient information in discovery to negate the need for an investigator. Regarding the second *Brady* factor, the trial court found that the State would have been burdened by having to obtain its own investigator upon receipt of Kruse's

-10-

investigator's report, which would have created an unnecessary delay for the trial. And regarding the third and final *Brady* factor, the trial court found that granting the request for investigator funding would have been "unproductive." Thus, the trial court denied Kruse's request.

**{¶22}** After analyzing the trial court's ruling on Kruse's first request for investigator funding pursuant to *Brady* and *Mason,* we cannot say that the trial court abused its discretion by denying the request because Kruse failed to demonstrate a particularized need to the trial court. In his memorandum attached to his request for an investigator, Kruse presented the trial court with a broad assertion about an "apparent transfer of behavior" (of the victims) theory regarding "something inappropriate [that] occurred" and nothing more. (Doc. No. 103 at 2). The memorandum also gives an estimate "that funds to procure an investigator would be less than one thousand dollars," but fails to reveal the identity of an investigator and how the funding amount was determined. (*Id.*) Lastly, Kruse's request for funds occurred just twelve (12) days prior to the start of the (then) scheduled trial, which we agree was made untimely. Thus, because Kruse's request was untimely, overly broad, and failed to provide the trial court with specificity as to the "particularized need," for the funding of an investigator, the trial court did not abuse its discretion in overruling this request.

*Second Ruling on Investigator Funds*

**{¶23}** Kruse filed a second request for an investigator on April 14, 2015. A hearing on a second motion for investigator funding was held on April 28, 2015, resulting in the trial court sustaining the motion in part, by granting Kruse up to $1,000 for the use of an investigator to help with trial preparation. However, the trial court restricted the use of the investigator funds for trial preparation only, not for testimonial expenses of the investigator. Kruse asserts that the trial court abused its discretion by imposing these restrictions since Kruse demonstrated a particularized need for the funding.

**{¶24}** Kruse's categorization of the April, 2015 ruling by the trial court regarding investigator funding is misplaced. In its ruling on this request, the trial court discussed the "particularized need" factors for funding. (Doc. No. 170 at 1). However, in its analysis of the "particularized need" factors, the trial court found that Kruse "**did not**" meet his burden of showing a particularized need required to satisfy the request for investigator funds for testimonial reasons. (*Emphasis added).* (*Id.* at 2).

**{¶25}** Thus, upon our review of Appellant's second motion, we find that the trial court followed the factors enunciated in *Mason* regarding the "particularized need" test and therefore did not abuse its discretion by allotting Kruse funds for trial

preparation only because Kruse failed to show a particularized need for testimonial expenses of an expert.

{¶26} Accordingly, Kruse's first assignment of error is overruled.

*Second Assignment of Error*

{¶27} In his second assignment of error, Kruse contends that he was denied effective assistance of counsel, claiming his counsel's performance fell below an objective standard of reasonable representation. Specifically, Kruse asserts that his trial counsel did not timely review discovery, resulting in full discovery not being provided to Kruse until a year after the initial request. Kruse also asserts his counsel was ineffective by filing the first request for investigator funds untimely. Further, Kruse contends that at trial, defense counsel did not object to the State's use of leading questions, which resulted in substantial prejudice to Kruse. Lastly, Kruse asserts that defense counsel's multiple instructions and corrections from the trial court as to how to impeach a witness and how to refresh the recollection of a witness fell below an objective standard of reasonable representation. For the reasons that follow, we disagree.

*Standard of Review*

{¶28} "'When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that the counsel's representation fell below an objective standard of reasonableness.'" *State v. Sanders,* 94 Ohio St.3d

150, 151, 2002-Ohio-350, 761 N.E.2d 18 quoting *Strickland v. Washington,* 466 U.S. 668, 687-88, 104 S. Ct. 2052 (1984). Additionally, "'[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" *Id.,* at 694. *See also, State v. Bradley,* 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989).

{¶29} In analyzing a claim for ineffective assistance of counsel, this court's scrutiny of counsel's performance must be highly deferential, with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Bradley, supra,* at 142, quoting *Strickland, supra,* at 687-88. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.*

*Analysis*

{¶30} Initially, we note that during the trial the State dismissed 12 of the 35 counts against Kruse, that Kruse was found "not guilty" of seven of the 23 counts, and the jury was unable to reach a verdict on one count. Defense counsel's ability to avoid convictions on more than one-half of the indicted counts does support the presumption that defense counsel's performance was within the range of reasonable professional assistance.

*Discovery and Motion Deficiencies*

**{¶31}** At the January 14, 2015 Motions Hearing, defense counsel informed the trial court that they had additional discovery concerns after being provided complete discovery by the State.[4] (01/14/15 Tr. at 4). Thereafter, the court concluded: "[w]ell, apparently, from what I'm hearing, they didn't – they didn't realize they didn't have everything." (*Id.* at 14). While the January 16, 2015 Journal Entry briefly mentions that discovery material had been available to counsel since August 27, 2013, the court held an evidentiary hearing on the matter and granted a continuance of the trial on January 21, 2015,[5] thus resulting in more time for trial preparation.

**{¶32}** Additionally, upon review of the additional discovery, defense counsel immediately requested funds to hire an investigator, which the trial court denied. (Doc. No. 127 at 2). Thereafter, defense counsel filed a second request for funds for an investigator/expert witness, which the trial court granted in part. (Doc. No. 170 at 2). "The reasonableness of counsel's determination concerning the extent, method and scope of any criminal discovery necessarily depends upon the particular facts and circumstances of each case." *State v. Allen,* 10th Dist. Franklin No. 02AP-862, 2003-Ohio-1114, ¶ 7 citing *State v. Wilson,* 8th Dist. Cuyahoga No. 61199,

---

[4] At the January 14, 2015 hearing, defense counsel represented to the trial court that it had received ten (10) CD's of additional discovery material from the State on the aforementioned date. (01/14/2015 Tr. at 4).
[5] No record of the evidentiary hearing held on January 21, 2015 regarding the matter of discovery was provided to this court.

1992 WL 309378, * 1 (Oct. 22, 1992). Here, defense counsel's persistence and ability to obtain funds to hire an investigator does not fall below an objective standard of reasonable representation. Additionally, being unaware of additional discovery materials is not the same as failing to review the discovery material. Kruse's argument regarding any discovery mistakes made by his counsel fails to show how such was prejudicial to his defense. Thus, Kruse has not satisfied the first prong of the *Strickland* test on this issue.

*Objections to Leading Questions*

{¶33} Kruse next contends that counsel was ineffective by failing to object to leading questions. Specifically, Kruse contends that his attorney failed to object to leading questions of M.C. and references the record where M.C. gave one-word answers to leading questions where no objection was made.

{¶34} In our review the record demonstrates that defense counsel *did* object to the State's use of leading questions to M.C. For example, the following exchange at trial establishes this fact:

> **Q.    (Questioning by Attorney Michener for the State) Now, later on did you discover that that same day [N.D.] had been sent back to Idaho?**
>
> **A.    (M.C.) Yes.**
>
> **Q.    And after that - -**

> **Attorney Leach: And again, Judge, I'm going to object to the leading. He's asked – phrase the question with a yes/no answer.**
>
> **Trial Court: All right. Don't lead.**

(05/11/15 Tr. Vol. II at 209).

**{¶35}** Additionally, the portions of the transcript that Kruse directs us to where defense counsel did not object does not rise to a level that would constitute an ineffective assistance of counsel claim. As the Ohio Supreme Court stated in *State v. Conway,* "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.3d 810, ¶ 103; *State v. Holloway,* 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988); *State v. Gumm,* 73 Ohio St.3d 413, 428, 1995-Ohio-24, 653 N.E.2d 253, *holding modified by State v. Wogenstahl,* 75 Ohio St.3d 344, 1996-Ohio-2219, 662 N.E.2d 311.

**{¶36}** Trial counsel is permitted to make strategic decisions regarding the use of objections to leading questions. As this court held in *State v. Dye*:

> Nevertheless, to the extent that any leading questions were used by the State and were not objected to, we would note that it is wholly within the trial court's discretion to allow leading questions on direct examination and therefore courts have typically found that any failure to object to leading questions does not constitute ineffective assistance of counsel. Furthermore, electing not to object to the use of leading questions, particularly when a child-victim is being questioned, could certainly fall within the ambit of trial strategy.

*State v. Dye,* 3rd Dist. Seneca No. 13-15-35, 2016-Ohio-986, ¶ 22. (Internal citations omitted). Defense counsel's objection to some, but not all leading questions could easily fall within counsel's trial strategy, and therefore, does not fall below an objective standard of reasonableness as required by the test in *Strickland.*

{¶37} Lastly, even though Kruse cannot satisfy the first prong of the *Strickland* test, even if he were able to demonstrate that counsel's performance fell below an objective standard of reasonableness, Kruse was *not* convicted on either count involving M.C. Even though he was not convicted on those counts involving M.C., Kruse avers that M.C.'s statements impacted the jurors' beliefs' as to allegations by F.K., S.K., and B.K. To support this blanket assertion of prejudice, Kruse directs us to no specific statement of M.C. that resulted in actual prejudice to Kruse. To the contrary, M.C.'s testimony resulted in a genuine issue of credibility for the defense to argue to the jury. For these reasons, we find Kruse was not prejudiced from defense counsel's trial tactics by not objecting to all of the leading questions asked by the prosecutor.

*Objections to Hearsay Statements*

{¶38} Kruse again contends that counsel's performance was so deficient as to result in ineffective assistance because "[n]o objection was raised to argue that statements made by F.K. were hearsay." (Br. Of Appellant at 13). Kruse then cites just one instance of a hearsay statement that was not objected to. (*Id.*). However, a

review of the entire transcript reveals that defense counsel *did* object to hearsay statements made by F.K. on multiple occasions.  The following excerpts are illustrative of defense counsel's objections to hearsay statements:

> **Q.  (Questioning by Attorney Kinsler for the State) So after that argument over the phone where she – what did she say – let me back up.  What did she say in that argument over the phone?**
>
> **A.    (F.K.) What did she say to?**
>
> **Q.    Jean Paul.**
>
> **A.    Oh. She said –**
>
> **Attorney Leach:  Objection.**
>
> **A.    Cause Jean Paul was –**
>
> **Attorney Leach:  Objection.**
>
> **Q.  He's objecting.  Just wait?**
>
> **Attorney Leach:  Hearsay.**
>
> **Trial Court:  Overruled.**

(05/12/15 Tr. at 188).

> **Q.    (Questioning by Attorney Kinsler for the State) After that, did anybody else in the house ever disclose to you that they had been touched inappropriately by Jean Paul?**
>
> **A.    (F.K.) [B.K.]**
>
> **Q.    What did [B.K.] tell you?**
>
> **Attorney Leach:  Objection, your Honor.**

> **A.** She didn't tell us. She –
>
> **Q.** When he objects, I need you to wait.
>
> **A.** Okay. I don't hear him objecting.
>
> **Attorney Leach:** Objection, your Honor.
>
> **Q.** Let him –
>
> **The Court: All right. Sustained.**

(*Id.* at 189).

**{¶39}** While it is true that defense counsel did not object to certain hearsay statements of F.K., which is discussed thoroughly under Appellant's third assignment of error, the record clearly reflects that defense counsel did object to other hearsay statements and questions when it was appropriate to object. Providing deference to counsel's judgments during trial, we find the assertion that Kruse was denied effective assistance of counsel on this basis without merit.

*Impeachment/Refresh Recollection Concerns*

**{¶40}** Finally, Kruse contends that because defense counsel had to be instructed by the court multiple times on the difference between impeaching a witness and refreshing a witness's recollection, counsel's performance fell below an objectively reasonable standard. We note as an initial matter that the trial court did instruct counsel, at a sidebar, on matters of witness impeachment and recollection refreshed. (*See, e.g.,* 05/13/15 Tr. Vol. I at 77-81). As such, the jury

was not privy to this conversation. Sidebars are commonplace during trial and for practical purposes are designed to assist counsel with rules of evidence and flow of testimony. Kruse fails to show us any specific prejudice that resulted from these corrections by the trial court. By failing to be specific as to how this prejudiced him, Kruse failed to meet his burden on this prong of his ineffective assistance of counsel claim.

{¶41} For the aforementioned reasons, Kruse's second assignment of error is overruled.

*Third Assignment of Error*

{¶42} In his third assignment of error, Kruse contends that the trial court committed plain error by not *sua sponte* prohibiting the use of leading questions by the State to M.C., one of the victims. Additionally, Kruse contends that it was plain error for F.K.'s testimony, containing hearsay statements, to be considered by the jury. We disagree.

*Standard of Review*

{¶43} Crim.R. 52(B) provides: "'plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'" *State v. Long,* 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978) quoting Crim.R. 52(B). The court, on their own motion or at the request of counsel, should exercise the

power to afford notice of plain error "only in exceptional circumstances, and exercise cautiously even then." *Id.* Additionally:

> "* * * The normal rule is that an appellate court should not consider questions which have not been properly raised in the trial court and upon which the trial court has had no opportunity to pass. The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice. To exercise the right freely would undermine and impair the administration of justice and detract from the advantages derived from orderly rules of procedure.'"

*Id.* at 95-96, quoting *Gendron v. United States,* 295 F.2d 897, 902 (8th Cir.1961). "In order to have a plain error under Crim.R. 52(B), there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Roberts,* 180 Ohio App.3d 666, 2009-Ohio-298, 906 N.E.2d 1177, ¶ 10 (3rd Dist.) citing *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

*Leading Questions*

**{¶44}** Kruse again rehashes his argument that portions of M.C.'s testimony contained leading questions, now asserting that it was plain error for the trial court to permit the State to use leading questions on its direct examination of M.C. Kruse contends that the leading questions were obvious defects and were prejudicial to Kruse. However, as discussed above, "it is wholly within the trial court's discretion to allow leading questions on direct examination." *Dye,* 3rd Dist. Seneca No. 13-15-35, 2016-Ohio-986, ¶ 22.

**{¶45}** Evid.R. 611(C), which governs the use of leading questions states, in part: "Leading Questions. Leading questions should not be used on the direct examination of a witness *except* as may be necessary to develop his testimony. * * *." (Emphasis added). *State v. Lewis,* 4 Ohio App.3d 275, 277, 448 N.E.2d 487 (3rd Dist.1982) quoting Evid.R. 611(C). As this court recognized in *Lewis,* "[t]he exception 'except as may be necessary to develop his testimony' is quite broad and places the limits upon the use of leading questions on direct examination within the sound judicial discretion of the trial court."

**{¶46}** While the record reveals that the trial court granted some leeway to the State in the development of M.C.'s testimony, we note that said leeway was not outside of the discretion of the trial court. M.C. was a minor testifying about her alleged sexual abuse by Kruse at trial, and Ohio "[c]ourt's have continued to emphasize the latitude given the trial court * * *, especially in cases involving children who are the alleged victims of sexual offenses." *State v. Rector,* 7th Dist. Carroll No. 01 AP 758, 2002-Ohio-7442, ¶ 30. *See also, State v. Wilson,* 2nd Dist. Montgomery No. 19618, 2003-Ohio-6229, ¶ 37; *State v. Jamison,* 6th Dist. Lucas No. L-12-1274, 2014-Ohio-3275, ¶ 30; *In re J.M.,* 3rd Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 30. After examining the entire record, and specifically the testimony of M.C. we cannot reasonably conclude that the trial court exceeded the

parameters of its sound discretion. Further, as we noted above, Kruse was found not guilty of the charges relative to M.C.

*Hearsay Statements*

{¶47} Kruse again points us to the testimony of F.K., stating that the trial court impermissibly allowed F.K. to testify as to hearsay statements of S.K. and B.K. Kruse contends that absent the hearsay statements of F.K., he potentially would not have been convicted of the counts related to S.K. and B.K.

{¶48} Specifically, Kruse raises concern with the following exchange involving F.K.'s "hearsay" statements relative to S.K. and B.K.:

**Q. (Questioning by Attorney Kinsler for the State) And what, if anything, happens with [B.K.] and [S.K.]? Where are they at?**

**A. (F.K.) Jean Paul comes outside and tells them he needs them to help him fix the curtains. And then locks all the door [sic] and takes them upstairs. And then 30 minutes later they come downstairs and we notice something is weird. Because why would he ask two little girls to ask him fix [sic] curtains when he could have asked like me or [N.D.], two older girls? So we took them like, as soon as they come out, which was like 30 minutes later. We come – they come outside. We ask them like, did Jean Paul do anything to you? And they – that's when they tell us that Jean Paul puts his – their shirts over their eyes and was going like this to their heads. [B.K.] and [S.K.] made that statement – statement that he was going like this to their head. So me and [N.D.]'s thinking, what else could he – and [S.K.] said that it was something big in her mouth. So we – me and [N.D.]'s thinking like, he put his penis in their mouths. And [S.K.] stated that he puts her on his bed and play [sic] with her private parts.**

**Q. Okay. How long does this – how long after they exit the house does this conversation take place?**

**A. Like right away.**

**Q. You said you were asking them about what was going on in the house?**

**A. Yes. We asked them if Jean Paul any [sic] did anything to them.**

**Q. Other than, you know, what you took to be oral sex, did either of the children, either [B.K.] or [S.K.] describe any other abuse that happened right then in the house?**

**A. Other than [S.K.] saying that he laid her on his bed and played with her private part, that was it.**

**\* \***

**Q. Okay. Did she indicate anything to lead you to believe what part she was referring to?**

**A. Her vagina.**

(05/13/15 Tr., Vol. I, at 53-54).

{¶49} Our review of the record reveals that prior to this exchange, the trial court dealt with the hearsay issue of F.K.'s testimony outside of the presence of the jury. (*Id.* at 39). Once the court recessed the jury, counsel for the State inquired of F.K. regarding the above cited testimony. (*Id.* at 40-43). And, after cross examination and arguments from the State and defense counsel, the trial court ruled that S.K.'s and B.K.'s statements (to F.K.) constituted excited utterances and were an exception to hearsay under Evid.R. 803(2). (*Id.* at 51). Thereafter, the jury re-entered the courtroom and the examination regarding S.K. and B.K.'s statements

made to F.K resumed. (*Id.*) While Kruse contends that the F.K.'s testimony was hearsay, plain error does not exist under the facts of this argument as the trial court specifically found that the statements were admissible as an exception to the hearsay rule under Evid.R. 803(2) during a hearing held outside the presence of the jury. Thus, we find that Kruse's argument is without merit and overrule assignment of error number three.

### Fourth Assignment of Error

{¶50} In his fourth assignment of error, Kruse contends that his convictions of rape, sexual battery, and gross sexual imposition were against the manifest weight of the evidence. Specifically, Kruse asserts that there was no evidence to support his convictions for rape, sexual battery, and gross sexual imposition for *all* of the children, and that the conviction pertaining to S.K. was against the manifest weight of the evidence because S.K. testified that Kruse did not sexually abuse her. For the following reasons, we disagree.

### Standard of Review

{¶51} In analyzing a claim that the conviction was against the manifest weight of the evidence, an appellate court:

> sits as the "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. * * * The appellate court, "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."

*State v. Johnson,* 3rd Dist. Shelby No. 17-08-06, 2008-Ohio-4784, ¶ 4 quoting *State v. Jackson,* 169 Ohio App.3d 440, 2006-Ohio-6059, 863 N.E.2d 223, ¶ 14 (citations omitted). However, in sitting as the thirteenth juror the appellate court should give due deference to the findings made by the jury. *Id.*

**{¶52}** With that standard in mind, we will discuss the rape, sexual battery, and gross sexual imposition convictions as they pertain to each victim in turn.

*Convictions regarding F.K.*

**{¶53}** After reviewing the entire record, we cannot say that each of the rape, sexual battery, and gross sexual imposition convictions[6] regarding F.K. were against the manifest weight of the evidence. To support his argument that these convictions were against the manifest weight of the evidence, Kruse avers there is a lack of physical evidence to support the convictions related to F.K.

**{¶54}** However, multiple witnesses for the State testified concerning the abuse of F.K., including the testimony of Dr. Gayle Hornor, Betsy Fraker, Amy Connolly, Gina Grady, and Christina Willis. The testimony of Dr. Hornor, the pediatric nurse practitioner at the Center for Family Safety and Healing at

---

[6] Convictions regarding F.K. comprised renumbered counts 1, 2, and 3 of Kruse's indictment.

Nationwide Children's Hospital examined F.K. on August 10, 2012 as part of a forensic interview. (5/13/15 Tr., Vol. I, at 23). Dr. Hornor testified that while F.K. had no physical signs of sexual abuse, the exam *did not rule out or confirm* sexual abuse because "[t]he vast majority of children, really only between less than ten percent of children who are sexually abused are going to have a physical finding on exam." (Emphasis added). (*Id.* at 26).

{¶55} Further, F.K. testified while residing at their home on Pepper Lane, she "woke up to feel his [Kruse's] fingers inside of [her]". (5/12/15 Tr. at 180). F.K. testified that once she moved Kruse jumped up and ran out of the room. (*Id.*). F.K. also testified that on a second occasion she woke up to feel Kruse's fingers again in her vagina. (*Id.* at 183). Thus, competent and credible evidence of rape, sexual battery, and gross sexual imposition exists in the record to support the jury's verdicts as to F.K.

{¶56} Further, Kruse contends that the convictions regarding F.K. should be overturned because F.K. recanted her statement prior to trial. While F.K. did recant her allegations by writing various family members letters of apology for "lying" about the abuse she suffered by Kruse, F.K. testified that she was instructed to write those letters by Emily Kruse. (*Id.,* at 58). F.K. also testified that she believed that if she did not write the letters she'd be "sent away." (*Id.* at 60).

**{¶57}** After examining the record and the evidence presented by the State, we cannot say that the conviction is against the manifest weight of the evidence. Accordingly, Kruse's assignment of error, as it relates to F.K., is overruled.

*Convictions regarding B.K.*

**{¶58}** After reviewing the entire record, we cannot say that the rape, sexual battery, and gross sexual imposition convictions[7] regarding B.K. were against the manifest weight of the evidence. While we agree that there was no physical evidence presented by the State as to Kruse's sexual abuse of B.K., we note the record contains testimonial evidence of abuse regarding B.K. N.D. and F.K. testified that B.K. disclosed sexual abuse by Kruse to them. (05/12/15 Tr. at 195; 05/13/15 Tr., Vol. 1, at 53-54; 05/13/15 Tr., Vol. 2, at 183-84). Additionally, a video interview between Jennifer Westgate ("Westgate"), a forensic interviewer/social worker at Nationwide Children's Hospital in Columbus, and B.K. was played for the jury. During that interview B.K. disclosed that "him (sic) [referring to Dad] touches our private part," and pointed to the vaginal area of an anatomically-correct female drawing. (08/10/2012 Video Interview Tr. of B.K. at 14). When Westgate followed-up and asked B.K. if "[h]e touches your pee-pee, right there?" (pointing to the vaginal area of an anatomically-correct female drawing) B.K. nodded her head in affirmance. (*Id.*). B.K. also described in detail

---

[7] Convictions regarding B.K. comprised renumbered counts 9, 10, 11, 12, 13, 14, 15, and 16 of Kruse's indictment.

how Kruse would "put medicine on it [referring to Kruse's penis]," and that the medicine would come from his bathroom. (*Id.* at 16-17). B.K. also told Westgate that "him [Kruse] open - - him (sic) say open your mouth and suck his pee-pee and I didn't want to." (*Id.* at 31).

{¶59} Kruse defends this testimony by contending that B.K. "transferred" the abuse she suffered by a sibling to Kruse. However, the record contains no evidence of Kruse's theory of "transference" in this case. Nevertheless, B.K. was able to identify and differentiate her sibling from her father.

{¶60} B.K. was also able to differentiate between Kruse and her sibling when she discussed her sexual abuse (by Kruse) with Angela Adkins ("Adkins"), B.K.'s foster mother. (05/15/15 Tr., Vol. 2, at 233-34). B.K. revealed to Adkins that she was abused by Kruse separate from a sibling. (*Id.* at 239-40). The following exchange occurred between Adkins and counsel for the state:

> **Q.  (Questioning by Attorney Kinsler for the State) When she opened up to you, what did she discuss?**
>
> **A.  (Adkins) She would - - really didn't go into a lot of details with me, but she would kind of share with me what would - - what she had talked about in counseling and just kind of her feelings, that she was sad, and she did mention bad touches and - -**
>
> **Q.  Did she explain who was giving her the bad touches?**
>
> **A.  Yes.**
>
> **Q.  And who was that?**

**A.    That was her father.**

**Q.   Did she ever describe anybody else as giving her bad touches?**

**A.    Not in any detail.**

**Q.    Can you explain that answer a little bit?**

**A.    Well, yeah.  She touched lightly on * * * as well, her brother.**

**Q.    Okay.  Anyone outside of those two names then?**

**A.    No.**

(*Id.*).

**{¶61}** Thus, competent and credible evidence supports that B.K. knew that she was abused by Kruse and by a sibling, and that she was able to differentiate the abuse involving Kruse separately from her sibling.  After reviewing the record, we cannot say that the jury lost its way and created a manifest miscarriage of justice regarding the convictions involving B.K.  Accordingly, we find Kruse's arguments regarding his convictions involving B.K. are without merit.

*Convictions regarding S.K.*

**{¶62}** Lastly, Kruse contends that his convictions of rape, sexual battery, and gross sexual imposition[8] regarding S.K. were against the manifest weight of the

---

[8] Convictions regarding S.K. comprised renumbered counts 21, 22, and 23 of Kruse's indictment.

evidence.  In support of this argument, Kruse points to the fact that S.K. recanted her abuse allegations, and that there was no physical evidence presented by the state.

**{¶63}** As an initial matter, we note that S.K. did not testify that Kruse abused her, unlike F.K.  In fact, S.K. only disclosed to F.K. and N.D. that Kruse had sexually abused her.  Specifically, S.K. testified as follows:

> **Q.   (Questioning by Attorney Michner for the State) Okay, what did you say?**
>
> **A.   (S.K.) [N.D.] asked me questions if dad put his thing in my mouth and that I was scared and that I had to lie and I said yes.**
>
> **Q.   So, you told her that dad had put his thing in your mouth?**
>
> **A.   Yes.**
>
> **Q.   Did that really happen?**
>
> **A.   No.**

(05/18/2015 Tr. at 11).  And on cross-examination, S.K. testified as follows:

> **Q.   (Cross Examination by Attorney McNeal for Kruse) And after you went outside and played, did you talk to any of your brothers and sisters about what happened?**
>
> **A.   (S.K.) Yeah, [N.D.] asked me questions.**
>
> **Q.   Okay, and what did [N.D.] ask you?**
>
> **A.   If dad put his thing in my mouth.**
>
> **Q.   And you said no, didn't you?**
>
> **A.   I said yes.**

**Q. Oh, you said he did put something in your mouth?**

**A. Yes.**

**Q. What did he put in your mouth?**

**A. His thing.**

**Q. Okay.**

**A. But it's not true.**

**Q. You say it's not true?**

**A. Yeah.**

(*Id.* at 13). Further, when S.K. was interviewed by Emily Combes ("Combes"), a social worker at the Center for Family Safety and Healing at Nationwide Children's hospital, S.K. failed to disclose any sexual abuse by Kruse to Combes. (05/14/15 Tr., Vol. II, at 174-75).

{¶64} However, the State's case of abuse of S.K. was premised upon the testimony of other witnesses. For example, N.D. testified that:

**A. (N.D.) * * * He took S.K. inside. Then I went back there tried (sic) to unlock the doors, and the doors were locked. A few minutes later S.K. comes out. She's smiling. We ask her what was wrong. She said that Jean Paul had her in the bathroom. Pulled her shirt over her head. He had put some medicine on his penis and made her suck on it.**

(05/13/2015 Tr., Vol. 2, at 183). Further, as discussed herein, F.K. also testified about this incident involving S.K., corroborating the statements S.K. made to N.D.

{¶65} N.D. and F.K. were not the only witnesses that testified regarding the sexual abuse of S.K. Lisa Golden, an Early Child and Mental Health Supervisor and Behavioral Health Specialist at Nationwide Children's Hospital counselled B.K., who disclosed during treatment that she (B.K.) observed S.K. getting "not okay touches from dad." (05/18/15 Tr. at 44).

{¶66} We are mindful that the weight to be given the evidence and the credibility of the witnesses are matters primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 277 (1964). "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶67} The jury had the opportunity to evaluate the credibility of each of the witnesses. Viewing the conflicting reports of abuse, with the role of the jury in mind, we cannot say that the jury lost its way and created a manifest miscarriage of justice in convicting Kruse on counts involving S.K.

{¶68} Accordingly, Kruse's assignments of error are hereby overruled.

{¶69} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**