[Cite as *State v. Elliott*, 2022-Ohio-3778.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

      v.

MICHAEL TODD ELLIOTT,

    DEFENDANT-APPELLANT.

CASE NO. 8-21-35

O P I N I O N

Appeal from Logan County Common Pleas Court
Trial Court No. CR 20 09 0209

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision: October 24, 2022

APPEARANCES:

    *William T. Cramer* **for Appellant**

    *Stacia L. Rapp* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Michael T. Elliott ("Elliott") appeals the judgment of the Logan County Court of Common Pleas, arguing that his six convictions for rape are against the manifest weight of the evidence; that his conviction for having weapons under a disability and his four convictions for firearm specifications are against the manifest weight of the evidence; and that R.C. 2967.271 ("the Reagan Tokes Law") is unconstitutional. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

{¶2} On May 20, 2020, Terry Schneider ("Schneider") was working at the Board of Elections in Logan County when he heard someone "sobbing and crying outside * * *." Tr. 393-394. Schneider went outside where he observed a woman holding a baby. Tr. 394. This woman was later identified as A.Y. Tr. 394, 398. Schneider testified that A.Y.

> **came into the shop. She said that somebody * * * had her locked in a room or in a house and she finally got out. She didn't have no way of calling anybody so she walked down that far [to the Board of Elections]. And * * * she was worried that he would come and get ahold of her and find her.**

Tr. 395. Schneider then called the police. Tr. 395. Officer Jason Boy ("Officer Boy") responded to this call. Tr. 399. A.Y. stated that Elliott, who she had been living with up until that time, had assaulted her. Tr. 373, 377, 384, 399. Officer Boy then ensured that A.Y. got to a domestic abuse shelter. Tr. 400, 406.

{¶3} On August 24, 2020, Leslie Joseph ("Joseph") was working as an emergency room nurse at the Mary Rutan Hospital. Tr. 196, 199. Joseph stated that J.F. came to the hospital, seeking treatment. Tr. 187. Joseph testified that J.F. eventually reported that she had been raped. Tr. 188. Officer Tanner Peterson ("Officer Peterson") of the Bellefontaine Police Department was then summoned to meet with J.F. at the hospital. Tr. 196, 199. Officer Peterson testified that J.F. was distraught, crying, and upset when he met with her. Tr. 200. He also observed that she had bruises on her arm, around her right eye, above her mouth, below her neck, and on her back. Tr. 200, 203-205. Ex. 1-9. Officer Peterson took a written statement from J.F. Ex. 12.

{¶4} Because J.F. identified Elliott as her assailant, Officer Peterson proceeded to arrest Elliott later that day. Tr. 210. Further, since J.F. had also reported that Elliott had a handgun and two shotguns with him during the night of the incident, the police also searched Elliott's residence for firearms. Tr. 202-203, 207, 213. Elliott lived on a property owned by his mother. Tr. 208-209. During a search of this property, the police did not locate any firearms, but they did discover a pellet gun, "pieces of a weapon that was taken apart," and some ammunition. Tr. 207-208, 212. After Elliott's arrest was reported in the news, law enforcement communicated with A.Y., who also alleged that Elliott had raped her during their relationship. Tr. 210, 383, 390.

{¶5} On September 8, 2020, Elliott was indicted on thirteen criminal counts. Doc. 2. These charges included two counts of rape in violation of R.C. 2907.02(A)(2), felonies of the first degree, with one of these counts carrying a firearm specification under R.C. 2941.141(A); one count of having weapons while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree; one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a felony of the fourth degree, with a firearm specification under R.C. 2941.141(A); one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree, with a firearm specification under R.C. 2941.141(A); and one count of intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(B)(1), a felony of the third degree, with a firearm specification under R.C. 2941.141(A).[1] Doc. 2.

{¶6} During the course of an investigation into Elliott, law enforcement came into contact with four additional women—K.L., P.H., H.S., and J.M.—who had each been in relationships with Elliott and who each alleged that he had previously raped them. Tr. 210. On January 12, 2021, the State filed a superseding indictment that added four counts of rape in violation of R.C. 2907.02(A)(2), first degree felonies, to the thirteen charges in the original indictment. Doc. 57. At this point,

---

[1] This listing only includes the charges that Elliott has challenged in this appeal. The charges in the indictment that he did not challenge in this appeal include the following: one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a felony of the fourth degree; one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree; two counts of domestic violence in violation of R.C. 2919.25(A); and three counts of violating a protection order in violation of R.C. 2919.27(A)(1), felonies of the fifth degree. Doc. 2.

Elliott had seventeen charges against him that included six counts of rape and four firearm specifications. Doc. 57.

{¶7} On September 1, 2021, the State dismissed two of the charges against Elliott. Doc. 199.[2] On September 14, 2021, Elliott pled guilty to three of the charges against him. Doc. 212.[3] After a three day trial, the jury returned verdicts of guilty on each of the twelve remaining charges against Elliott. Doc. 57, 238. The jury also found Elliott guilty of the four firearm specifications. Doc. 238. On November 2, 2021, the trial court issued its judgment entry of sentencing. Doc. 245. Elliott received two indefinite sentences pursuant to the Reagan Tokes Law. Doc. 245. Altogether, Elliott was sentenced to serve an aggregate prison term from seventy-four years and five months up to seventy-nine years and eleven months. Doc. 245.

{¶8} Elliott filed his notice of appeal on November 8, 2021. Doc. 255. On appeal, he raises the following three assignments of error:

**First Assignment of Error**

**The weight of the evidence did not support the convictions for rape in counts five, ten, and fourteen through seventeen.**

**Second Assignment of Error**

**The weight of the evidence did not support the conviction for having a weapon while under disability in count three and the firearm specifications in counts one, three, four, and five.**

**Third Assignment of Error**

---

[2] The State dismissed the two counts of domestic violence. Doc. 199.
[3] Elliott pled guilty to the three counts of violating a protection order. Doc. 212.

**Indefinite prison terms imposed under the Reagan Tokes Law violate the jury trial guarantee, the doctrine of separation of powers, and due process principles under the federal and state constitutions.**

*First Assignment of Error*

**{¶9}** Elliott argues that his six convictions for rape in violation of R.C. 2907.02(A)(2) are against the manifest weight of the evidence. For the sake of clarity, we will consider his rape conviction for the fifth count in the superseding indictment in a separate legal analysis from his rape convictions for the tenth, fourteenth, fifteenth, sixteenth, and seventeenth counts in the superseding indictment.[4]

Legal Standard

**{¶10}** The manifest weight of the evidence analysis examines whether the State has carried its burden of persuasion at trial. *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 58 (3d Dist.), citing *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 29 (3d Dist.). In this process, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 12, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

---

[4] After the State dismissed two charges and Elliott pled guilty to three charges, only twelve of the counts in the superseding indictment remained for trial. Doc. 213. The trial court renumbered the twelve remaining counts on the first day of the trial. Doc. 213. However, in his brief, the appellant uses the numbers that were assigned to these counts in the superseding indictment. Doc. 57. For the sake of simplicity, we will use the numbers in the superseding indictment to identify each challenged count in this opinion.

**{¶11}** Accordingly, an "appellate court sits as a 'thirteenth juror' * * *." *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 388, 1997-Ohio-52, 678 N.E.2d 541, 547 (1997).

> Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *Thompkins* at 387, 678 N.E.2d 541.

**{¶12}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

**{¶13}** To prove the crime of rape in violation of R.C. 2907.02(A)(2), the State must establish that the defendant "[1] engage[d] in sexual conduct with another" while "[2] purposely compel[ling] the other person to submit by force or threat of force." R.C. 2907.02(A)(2).

Legal Analysis for Count Five

**{¶14}** At trial, J.F. testified that she knew Elliott for roughly fourteen to fifteen years by the time of the trial and that they had been in a romantic relationship at one point. Tr. 216. At trial, she testified that she did not remember everything that she had reported at the hospital. Tr. 220. The State then presented J.F. with the statement that she had written for the police on August 24, 2020. Tr. 222. J.F. then identified and read the following statement into the record:

> **Michael Todd Elliott was a friend of mine for 13 years. Aug. 23, '20 I went to spend the day with Michael, following him while he rides his skateboards. Cooked dinner for him and everything was fine until around 10:00 p.m. He wanted sex. I didn't want to. He got on top of me and held me down while he was taking my clothes off. I told him no but he was so sure he was going to get his way. I kept fighting trying to get away. He proceeded to hold me down. I finally got away from him for a minute and kicked him in the balls. He became really mad. He took my purse and threw it from across the room and hit me in the face. He got me down on the floor again, held me down and penetrated me. \* \* \* [H]e was shoving up against me so hard. It felt as though he was ripping my skin off my private parts.**
>
> **He was choking me and telling me he was going to kill me. At that point he choked me with both his hand around my neck until I passed out. When I opened my eyes he was sitting at the kitchen table staring at me. I stood up and he shoved me back down and wouldn't let me leave. My purse had spilled all over the floor. He wouldn't give me my money nor my prescription pills to me. He had my car keys. Wouldn't give them back. I told him I was coming up here to the hospital and show them what he did. At that point he threw me up against the kitchen counter and told me once again that if I did go to the hospital he would come out to the house where I live and burn it down with me in it.**

Tr. 220, 222-223. At trial, she stated that she was, "at that time * * * on a medication that was making [her] * * * hallucinate." Tr. 221. J.F. then stated that she had also been using methamphetamines with Elliott and affirmed that this may have caused her to "[m]aybe see things that aren't there[.]" Tr. 235.

{¶15} J.F. testified that she had consensual sex with Elliott on the night of August 23, 2020, and that, after they had sex, Elliott told her that he loved A.Y. Tr. 233, 234, 239. J.F. stated that this led to an argument and that she wanted to leave. Tr. 234. She affirmed that, as she was leaving, she "fell down the stairs." Tr. 234.

> **I fell. Now, * * * like I said, I was on some medication, which they say doesn't make you hallucinate. It did. I swear to God it did. Okay? I saw things that was not there. I wrote statements that I don't even remember writing.**
>
> **\* \* \***
>
> **So I know I fell, but I'm not—if—I'm not for sure if I fell coming out the door or going down the steps.**

Tr. 234. She reported that the injuries in the pictures of her came from falling down the stairs and did not come from Elliott hitting her. Tr. 238. She stated that Elliott "never touched" her that night. Tr. 238.

{¶16} Further, J.F. said, "I never said he raped me. Ever. I never pressed charges of rape." Tr. 235. However, the prosecution questioned J.F. about when she realized that she had hallucinated her allegations. Tr. 243. J.F. replied:

> **About a week after it happened because I felt really bad, you know. I kept trying to think and think and think and then it just**

**started coming to me about this. And I stopped taking that medication * * *.**

Tr. 243. The prosecution then noted that the preliminary hearing on this matter was nine days after the alleged incident on September 2, 2020 and that J.F. wrote a victim impact statement on September 20, 2020. Tr. 230, 243. *See* Ex. 22, 23.

{¶17} The prosecution then asked if J.F. began to resume contact with Elliott in January of 2021. Tr. 232. J.F. then admitted that she had been texting and calling Elliott regularly. Tr. 232. The prosecution then asked several questions about her beliefs about hallucinating on the night of the alleged incident:

**[Prosecutor]: You talked to Todd [Elliott] about this medication theory quite a few times, right?**

**[J.F.]: He even looked it up on his phone for me.**

**[Prosecutor]: Okay. You sent him pictures of your pill bottles?**

**[J.F.]: Yes, I did.**

**[Prosecutor]: And isn't it true that when you did that you talked about the fact that you were off your meds is why you were hallucinating, not because you were on your meds?**

**[J.F.]: No. I was on my medication at that time. That's what made me hallucinate. And I don't take that medication anymore.**

**[Prosecutor]: Okay. And isn't it true that when you were talking to Todd [Elliott] about this medication theory, neither one of you mentioned methamphetamine at all.**

**[J.F.]: No, we did not.**

Tr. 241-242. J.F. then indicated that this was the only instance in which the medication she was taking made her hallucinate. Tr. 244.

{¶18} The prosecution then introduced a recording of a police interview in which J.F. played voicemails that Elliott had left on her phone. Ex. 21. At trial, J.F. identified her voice and Elliott's voice on the recordings. Tr. 228. In the first voicemail, Elliott said: "Yeah, I think it's funny to have me sit around and wait all f***ing day on your stupid a**. Well, that's all right 'cause I'll get even with you." Ex. 21. At the police interview, J.F. explained that this voicemail was left because "he wanted me to show up, and I wouldn't go up there because he wanted to have sex, and I knew that, so I didn't want to go up there. And I didn't go * * * to his place." Ex. 21. "You ain't nothing but a lying a** b***h. F**k you. * * * Next time you want to f**king come around me I might smack them f**king fake teeth out of your f**king mouth. F**k you." Ex. 21. However, at trial, J.F. stated that Elliott made these statements because they were having a dispute over some money that she owed to Elliott. Tr. 236.

{¶19} On cross-examination, J.F. again reiterated that she had consensual sex with Elliott on August 23-24, 2020; that they had an argument about A.Y.; that she had hallucinations that evening; and that a fall led to her injuries. Tr. 233-234. She also admitted that she had convictions for passing bad checks and for theft. Tr. 237. While the State had noted that J.F. had sought a civil protection order against Elliott in 2014, J.F. explained that the reason she got this civil protection order

because they were having a dispute over rent and that they agreed to sign a consent agreement to resolve this issue.  Tr. 217, 236.

{¶20} Officer Peterson testified at trial about his interaction with J.F. on August 24, 2020.  Tr. 197.  He described J.F's demeanor at that time, stating that she "was extremely upset, kind of distraught, and was crying when I spoke with her."  Tr. 200.  He then relayed what J.F. had reported on that evening:

> **She explained that she had hung out with Michael Todd Elliott for most of the day while he skateboarded.  She said everything was good until about 10:00 when he wanted to have sex with her.  She did not want to have sex at that time with him, and he had forcefully * * * put himself on her and began removing her clothes.**
>
> **\* \* \***
>
> **After that she said that she had told him she didn't want to.  He continued to stay on top of her and she was able to break away at some point and kick him in the testicles.  So he got mad after that incident took place, and he did—he picked up a purse and threw it across the room at her striking her in the face.**
>
> **\* \* \***
>
> **After the purse had been thrown, he had re-approached her, climbed back on top of her, had both of his hands around her neck, and forcefully penetrated her.  Which she said to the point that it felt like it was ripping the skin off of her.**
>
> **\* \* \***
>
> **She—she stated once he was on top of her, he had both hands around her neck and continued to put pressure on her and said he was going to kill her.  At that point she lost consciousness.**

Tr. 201-202. He testified that, on the basis of this report, the police arrested Elliott later that day. Tr. 207.

{¶21} Officer Peterson then identified the pictures that he took of J.F.'s injuries at the hospital. Tr. 203-206. Ex. 1-9. He noted that the pictures showed that J.F. had bruising on her nose, around her eye, around her shirt collar, forearms, and her lower back. Tr. 204-206. Officer Peterson then stated that the bruises on her neck were consistent with strangulation and that the bruises on her forearms were consistent with being physically restrained. Tr. 205-206.

{¶22} Joseph, a registered nurse, testified that she provided medical care to J.F. on August 24, 2020. Tr. 186. At that time, J.F.

> **had a bruise and swelling to her right eyebrow, she had some swelling to her right upper lip, she had some bruising to her left upper arm, some bruising and tenderness to her back, and she had a little bit of * * * discoloration or light pink coloration to her right collarbone.**

Tr. 189. Joseph testified that J.F. "said that she had been assaulted by a friend, and initially she stated that she was not sexually assaulted." Tr. 187. She then stated that J.F. told her that "there had been a disagreement between the friend and that he had grabbed her purse and threw it at her, which is what caused her injuries on her face, and that he had grabbed her and tossed her around." Tr. 190.

{¶23} However, during the course of her treatment, J.F. "stated she did have some sexual assault; that the alleged assailant had penetrated her with his penis." Tr. 187. Joseph testified that, in her experience, it is not unusual for a sexual assault

-13-

victim to delay disclosing a sexual assault during the course of treatment.  Tr. 187.

She added that "[s]ometimes they [sexual assault victims] are guarded about what

they have to say, maybe not quite feeling like they feel comfortable enough to have

that conversation."  Tr. 188.  On cross-examination, Joseph stated that J.F. chose

not to consult with a Sexual Assault Nurse Examiner and did not have a SANE

examination performed.  Tr. 191-193.

**{¶24}** Paula Strebig ("Strebig"), who is a nurse practitioner in Logan County,

testified that she provided medical care for J.F. on September 1, 2020.  Tr. 177.

Strebig stated the following:

> **She [J.F.] came in complaining mostly of headaches.  She stated
> that she'd been raped, that she had been assaulted.  She had a big
> knot on her head, bruising below and above her eyes.**

Tr. 178.  Strebig testified that J.F. did not name her assailant, only saying "that it

was someone that she knew, that it was a male."  Tr. 179.

**{¶25}** During this visit, Strebig reviewed the medications that J.F. was

taking.  Tr. 179.  She testified that J.F. was not taking any medications that were

capable of causing hallucinations.  Tr. 179.  Strebig also testified that she was not

aware of J.F. ever changing the story of how she received her injuries during the

course of her treatment at this practice.  Tr. 180.  On cross-examination, Strebig

affirmed that J.F. had a concussion; that "any number of things can cause blunt force

trauma"; and that falling downstairs could result in such an injury.  Tr. 183.

-14-

{¶26} At trial, Elliott testified in his own defense. Tr. 490. He testified that, on the night of the incident, J.F. was on a medication and "just started acting really weird." Tr. 513. He stated that J.F. began to believe that A.Y., his most recent girlfriend, was "hiding in the living room." Tr. 513. He said:

> **We were in the middle of having sex, and she said What the f\*\*k is that b\*\*\*h doing under the blankets? And I stopped and—you know, I'm on top of her \* \* \* and I'm like what did you say? She goes Tell that f\*\*king b\*\*\*h to get out from behind the couch. I'm going to beat her a\*\*. I got off of her and I said, great, you're going to have another crazy attack right now. \* \* \***

> **I went in the bathroom and I cleaned off and put my shorts on, and this was approximately midnight. I sat down at the kitchen table \* \* \* and she got up and she was cussing me. \* \* \***

> **And while she was doing that, I said You know what? I love \* \* \* [A.Y.]. And that was the worst thing I could say. I mean, she would be so possessive of me just seeing me talking to another girl. \* \* \***

> **[J.F.] got to the door. \* \* \* [S]he's standing in the doorway looking around, looking back, cussing. She called me all kind of names. I got up, walked over to the door, and she stepped back and shut the door and locked it. \* \* \***

> **And I had a bear that was carved by a chain saw \* \* \*. So I turned the porch light off and locked the door and I went in the other room and just laid down. I heard her—I heard her stuff out there being knocked over and stuff and then I heard a big crash: Dub, dub, dub, dub, dub. And I thought she done chucked my bear down the steps. \* \* \***

> **I went to go to work that next morning and I went outside \* \* \* you know, looking if the bear's knocked over and there's other stuff that's knocked over on the porch.**

> **I kind of straightened it up and I went to go down the steps and there was lipstick and a brush and an empty pill bottle and stuff all over my steps. * * ***

Tr. 514-517. Elliott also testified that he and J.F. had consensual sex on the night of August 23, 2020 and that he did not beat or strike her. Tr. 514.

**{¶27}** On cross-examination, Elliott stated that he had J.F. send pictures of her pill bottles. Tr. 526. While he had previously testified that J.F. took Tramadol, he admitted that neither of the bottles in the pictures he was sent by J.F. were labeled "Tramadol." Tr. 513, 526-527. He further indicated that J.F. informed him that these two pill bottles contained the medications that she was taking, telling him that she was "off the Tramadol." Tr. 527.

**{¶28}** The fact that J.F. contradicted her prior written and verbal statements to the police and her medical providers at trial does not render this conviction against the manifest weight of the evidence.[5] A "victim's recantation is an issue of credibility." *State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶ 14. When a witness's trial testimony conflicts with prior statements to the police, "the finder of fact [is] * * * free to believe * * * [the witness's] original statements to the police." *State v. Lungaro*, 9th Dist. Medina No. 2951-M, 2000 WL 202098, *3 (Feb. 16, 2000). *See State v. Butler*, 6th Dist. Lucas No. L-08-1390, 2010-Ohio-

---

[5] We note that Elliott did not challenge the admissibility of J.F.'s prior written or verbal statements to the police at trial or on appeal. *See* Tr. 200-203; 220-224.

178, ¶ 8-9, 15; *State v. Black*, 7th Dist. Belmont No. 15 BE 0076, 2017-Ohio-4136, ¶ 22-23.

**{¶29}** Having examined the materials in the record, we conclude that the evidence presented at trial does not weigh heavily against Elliott's rape conviction for the fifth count in the superseding indictment. Further, there is no indication in the record that the jury lost its way and returned a verdict on this charge that was against the manifest weight of the evidence. Accordingly, we find this challenge to be without merit.

Legal Analysis for the Remaining Five Rape Counts

**{¶30}** *Count Ten*: A.Y. testified that she dated Elliott in between November of 2016 and May of 2020; lived with him for a time; and had a son with him. Tr. 373-374. She testified that Elliott "had hit me, choked me, he's blacked my eye, slammed me on my belly twice while I was pregnant" when he was "upset or wasn't getting his way." Tr. 374. She stated that, on one occasion, Elliott

> **choked me, slammed me—slammed me on the floor between the bed and the wall, and then the next day * * * he wanted me to jump in the shower with him. I didn't want to. And since I didn't want to I got choked and slammed around in the shower.**

Tr. 375. She also stated that Elliott "choked me out on several times when I've blacked out on numerous occasions." Tr. 376. She affirmed that Elliott would try to "restrain [her] * * * movements by blocking * * * exits," testifying that Elliott

> **had screwed a board to the floor in Springfield to where I couldn't leave * * *, and then he would put a big machine part, it was one**

> **of the heavy machines for floor sanding, right in front of the door and everything, I can't move it, to block us.**

Tr. 378. A.Y. also testified that Elliott had threatened her with a gun. Tr. 379. She also stated that Elliott had threatened her with a gun and that "[h]e's threatened to kill me and bury me where nobody would know. He's threatened to hurt my mom, my step dad, my brother, and our kids." Tr. 379-380.

{¶31} A.Y. testified that Elliott would commit acts of sexual violence against her "[s]everal times a week." Tr. 381. She then detailed several incidents that gave rise to the charge in Count Ten of the superseding indictment:

> **I was seven-and-a-half, eight months pregnant with [her son] * * * and he [Elliott] wanted to mess around and I didn't really want to. He told me, well, you can just blow me. And even without a choice that I would do it.**
>
> * * *
>
> **He wanted me to give him a blow job and he pretty much forced me to do it. And I didn't do it the way he wanted, so he slammed me on my belly twice really hard.**

Tr. 382. She then stated the following:

> **It's been numerous times where if I didn't want to he would pretty much tell me you're going to, pretty much didn't have a choice. I would be beat up if I didn't. Even if I did mess around with him, he'd still beat me up during it.**
>
> * * *
>
> **Then I would get hit, kicked right to my mid to lower back, hit right underneath my ribs.**
>
> * * *

> **He'd pretty much pin me to where we would mess around and he would like to grind on me so hard he would grind my bone.**
>
> * * *
>
> **[H]e would, you know, put his penis in me and then he would try to keep grinding me so hard.**

Tr. 382. She further clarified that she was referring to vaginal penetration in this particular incident. Tr. 383.

{¶32} A.Y. testified that, in May of 2020, Elliott told her to plug in a fan. Tr. 376. To do so, she had to move his snowboards out of the way. Tr. 376-377. But Elliott "screamed and yelled at me and hit me with the motorcycle helmet." Tr. 377. The next morning, A.Y. decided "she did not want to be a part of the family * * *." Tr. 377. She then took her son and "left the split second after Elliott left" for work that morning. Tr. 378. She began "walking toward one of [her] * * * cousin's, but she wasn't home." Tr. 378. She then "walked over to right around behind Speedway and someone called the cops for us." Tr. 378.

{¶33} Schneider testified at trial that he was the person who discovered A.Y. and called the police on May 20, 2020. Tr. 393-394. He testified that A.Y. "was crying and just—she was all beside herself." Tr. 394. Schneider stated that A.Y. indicated that she had been "locked in a room or in a house and she finally got out" and that "she was worried that he would come and get ahold of her or find her." Tr.

395. He testified that he did not know A.Y. before he encountered her on that morning. Tr. 395

{¶34} Officer Boy responded to the call placed by Schneider. Tr. 398. When he first saw A.Y., "[s]he was just trembling" and "[s]he was crying." Tr. 399. He then stated the following:

> **She [A.Y.] told me that she had been moving a snow board, and— while he [Elliott] was asleep and that it had woken him up and it angered him when she was trying to plug in a fan so he punched her in the back of the head.**

Tr. 399. Officer Boy also testified that he tried but was unable to make contact with Elliott. Tr. 401. Thus, he admitted that he only had information from A.Y. Tr. 401. However, he referred A.Y. to a domestic abuse shelter for women. Tr. 400.

{¶35} On cross-examination, A.Y. stated that she did not tell her initial counselor about being raped and that she doesn't "really bring up" this topic "to anybody." Tr. 385. She also stated that she did allege that Elliott had sexually assaulted her when she sought a civil protection order against him. Tr. 387-388. She did not speak about being raped by Elliott until she was contacted by a detective. Tr. 390. She also indicated that she did not leave Elliott earlier because her "family didn't * * * want me around * * *." Tr. 384, 389. While she had been acquainted with two of Elliott's other accusers, she did not know H.S. or K.L. Tr. 390.

{¶36} *Count Fourteen*: K.L. stated that she began dating Elliott when they were in high school and that they eventually moved in together. Tr. 292. She

testified that Elliott physically abused her and that she "went to work many times with black eyes, cracked rib, a chipped elbow." Tr. 294. K.L. further testified that

> **[there were] just numerous times of being choked. And I got to the point when he would do it [choke her] I would just pretend to pass out because I was so afraid he was going to kill me and I wouldn't wake up, so I just pretended to pass out.**

Tr. 297. She then recounted the following incident:

> **In early '97 shortly before I got away from him in the apartment on Sandusky Street I was* * * in the living room sitting on the sofa, and he was there and he * * * wanted to have sex and I put up resistance; I didn't want to. I told him no, and we argued and argued. He was so mad he came over to the sofa and took his cigarette out of his mouth and put it out on my thigh and then just snatched ahold of me and drug me in the bedroom and beat me and choked me. I just pretended to pass out so he could do what he had to do.**

Tr. 297. She then clarified that "[h]e raped me" and "put his penis in my vagina."

Tr. 297. K.L. also stated that Elliott would also threaten and restrain her:

> **He'd just show the weapon of choice that day, and if you didn't do what he wanted, well, he either threatened you personally with it or your family with it. And then the family was always 'I know where your parents live. I know where your sister lives and I can take care of them.'**
>
> **\* \* \***
>
> **There was one time in * * * [h]e had gotten physical again and beat me again and I lost consciousness again and I ended up waking up in a closet that he had locked me in and a friend of mine had found me in there.**

Tr. 298. Another of Elliott's accusers—P.H.—subsequently testified at trial that she was the person who had discovered K.L. locked in the closet. Tr. 329-330.

-21-

{¶37} On cross-examination, K.L. testified that her father was a police officer and that he "tried to help" her. Tr. 310. However, she stated that she believed that she "could change Todd [Elliott]" and that she never told her father that Elliott had raped her. Tr. 310. K.L. then testified that she did not report Elliott earlier because she "was scared to death of Mr. Elliott." Tr. 315. After she left him, she did not tell anyone about having been raped for some time. Tr. 315-316. K.L. also admitted that, in an action over custody over their son, she did not mention that Elliott had beaten or raped her. Tr. 311. Their son went to live with Elliott because "it was his choice" to be with his father. Tr. 319. She testified that she never observed Elliott behave violently towards their son. Tr. 319. K.L. testified that she was acquainted with P.H., H.S., and J.M. Tr. 320.

{¶38} *Count Fifteen*: P.H. testified that she lived with Elliott "back in the nineties up to 2000 * * *." Tr. 322. She testified that

> **[t]here were times when Michael Todd Elliott would choke me to where I would be unconscious. He also backhanded me across my nose, blacking both my eyes. Multiple occasions he would grab me, throw me down.**
>
> **\* \* \***
>
> **There were several times when he would not choke me to where I did not lose consciousness. The last time that Mr. Elliott choked me I did lose consciousness.**

Tr. 324, 326. On one occasion, "[h]e had put a .22 to my head, threatened to shoot" her. Tr. 324. She then detailed the following incident:

> **Mr. Elliott had taken me to a place, a residence at his mother's home. It was a duplex apartment. I'm not quite sure what kind of bench it was, but he had restrained me to that bench and put the leather belt around my neck and forced himself on me anally and vaginally.**

Tr. 328. She then affirmed that this was not a consensual encounter. Tr. 328. She also testified that Elliott would threaten her:

> **He had repeatedly always told me that if I did not do or like what he had put in place that he would kill my kids and that he would kill my mom and he would kill me.**

Tr. 328. P.H. then testified that she went to the police to report Elliott after he had "gotten physical with" her. Tr. 331. She stated the following:

> **After I made the report, I went and stayed with a friend * * * [As] I was walking * * * to my friend's house, * * * Todd [Elliott] pulled in with—in his Monte Carlo kind of blocking me so I couldn't get around him and he made me get in the car[.] * * * [H]e told me that if I did not tell them [the police] that I lied on him that I would not ever see my children again if he killed me or if he killed them.**

Tr. 332. P.H. testified that, when the police came to talk to her, she stated that she lied about Elliott. Tr. 332. As a result of this incident, she was convicted of falsification and spent three days in jail. Tr. 332. P.H. also testified that she went to a shelter to get away from Elliott but returned to him because she was afraid of him. Tr. 333-332. She explained that Elliott would threaten to "kill my mom or my children." Tr. 333.

{¶39} On cross-examination, P.H. indicated that she obtained a protection order against Elliott in 2001 but did not remember disclosing the allegations of rape

in that process. Tr. 334, 339. However, the protection order did mention "[p]hysical abuse, choking, grabbing, pushing. Verbally threatened to kill me if I left him." Tr. 339. She then stated the reason that she did not report Elliott for rape in 2001:

> **Because at the time I was like 30 years old and I did not realize that at the time having sex with somebody, telling somebody no or having sex with somebody unwillingly was rape. I mean, even when you're married to somebody you don't realize if you don't want to have sex with them and they do it anyway that it's rape.**

Tr. 340. P.H. testified that she never went to the police to report Elliott but that the police came to her in 2020. Tr. 336. She also testified that she knew K.L. and H.S. but that she did not know J.F. or A.Y. Tr. 335-336.

{¶40} *Count Sixteen*: H.S. testified that she lived with Elliott roughly in between 2000 and 2002. Tr. 343. At trial, she said that Elliott "has shoved my head against a car window, he has choked me, pushed me, slapped me." Tr. 344. She also stated that Elliott has lifted her into the air by her throat, though she stated he did not use weapons or restraints on her. Tr. 344. She then detailed the following incident:

> **[H]e wanted to have sex, so I agreed to have sex with him, but * * * he wanted to have anal sex and I did not want to have anal sex. That is not something I ever wanted to do. And he shoved it in anyways and I passed out, and when I woke up I had used the restroom on myself in the bed.**

Tr. 346-347. She then clarified that Elliott penetrated her with his penis in this incident. Tr. 347. H.S. testified that, when she finally left Elliott, she "went into

hiding, and didn't look back." Tr. 347-348. When asked why she did not leave Elliott sooner, she said the following:

> **I did leave earlier and we would talk and try to reconciliate [sic] since we had children together, and we tried a couple times and it just didn't work. And I just was done with him putting his hands on me and doing the things he did to me and my children so I left.**

Tr. 349. She also testified that she was acquainted with K.L., P.H., and J.M. but that she did not know J.F. or A.Y. Tr. 348-349.

{¶41} On cross-examination, H.S. testified that she did not mention having been raped by Elliott when she sought a civil protection order against him. Tr. 350. She also did not tell her doctor about any of the physical abuse that she alleged while she was pregnant and living with Elliott. Tr. 353. However, she stated that she did tell a person at an association that provided assistance to victims in 2002. Tr. 350-351. She also stated that she told several members of her family and several of her friends about being raped by Elliott. Tr. 352. H.S. stated that she allowed the children she had with Elliott to have visitation with him until 2009. Tr. 355.

{¶42} On redirect, she explained that she allowed her children to go to Elliott's house for visitation because he was with J.M. at that time. Tr. 356. H.S. said she believed that J.M. would take care of the kids. Tr. 356. She also gave the following reason for not mentioning being raped when she sought a civil protection order:

> **[W]hen I mentioned * * * him hitting me and he told the judge that I hit him back, the judge said that he wasn't going to do anything about it because I had hit him back in self-defense.**

Tr. 356. H.S. then testified that she did not pursue further legal action against Elliott "[b]ecause any time that [she] * * * talked to law enforcement they did nothing about it." Tr. 356.

{¶43} *Count Seventeen*: J.M. testified that she had two children with Elliott. Tr. 358. She said that, on one occasion, Elliott "picked me up by my throat and threw me across the room * * *" during an argument. Tr. 360. She then detailed the following incident:

> **When I was on my period he insisted that he had to have anal sex at that point. I said no. Told him no multiple times. And he told me we were—it would be the easy way or the hard way, it was my choice. And then he held me down and did it anyways.**

Tr. 361. She then added the following details:

> **I was laying in bed trying to go to sleep and he came in there and started rubbing his hands on me, and I told him that I was on my period, to leave me alone. And he said that it didn't matter, and he rolled me over and he climbed on top of me and I had my arms under my chest so I * * * wasn't pressed into the bed and I told him no, that I didn't want to do that, that it hurt, and he said, well, the easy way or the hard way, you decide. And then he put all of his weight down on me and did it anyways.**

Tr. 361. On cross-examination, J.M. testified that she filed for multiple civil protection orders against Elliott and had been involved in custody proceedings over their children but did not mention being sexually assaulted by Elliott in these actions. Tr. 364. She also testified that, while she "went to the police," she never

reported being sexually assaulted by Elliott to law enforcement. Tr. 364. She also stated that she had been acquainted with H.S., P.H., and K.L. Tr. 364.

{¶44} Finally, at trial, Elliott denied beating or raping K.L, P.H., H.S., J.M., J.F., and A.Y. Tr. 499, 501, 506, 509, 514, 518. He further testified that the first he had heard of any such allegations was the year before his trial. Tr. 500. He also denied restraining any of these women against their will, choking any of these women, or "pull[ing] a firearm or knife on them * * *." Tr. 519. While Elliott's testimony contradicted that of his accusers, "the mere fact that there is conflicting testimony does not mean that the evidence weighs heavily against conviction." *State v. Black*, 3d Dist. Van Wert No. 15-20-07, 2021-Ohio-268, ¶ 9. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Kruse*, 3d Dist. Union No. 14-16-15, 2017-Ohio-5667, ¶ 66 quoting *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶45} Further, Elliott also points to the fact that the victims of these five alleged rapes delayed reporting these incidents to argue against these five convictions. However, most of these women testified as to the reasons that they delayed reporting these incidents. Tr. 315, 332, 340, 356, 384, 389. Several of these women also testified that they were afraid of Elliott because of his repeated threats of physical abuse. Tr. 315, 332-333, 379-380. Further, courts have noted that "[i]t is not uncommon * * * for victims of abuse to delay their reporting." *State v. Berila*,

9th Dist. Medina No. 19CA0007-M, 2020-Ohio-3523, ¶ 24. *See also State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 50; *State v. Cook*, 11th Dist. Lake No. 2016-L-079, 2017-Ohio-7953, ¶ 49.

**{¶46}** Having considered the testimony at trial on the basis of its weight and credibility, we conclude that the evidence in the record does not weigh heavily against any of these five convictions. Further, there is no indication in the record that the jurors lost their way and returned verdicts on these charges that were against the manifest weight of the evidence. Accordingly, his first assignment of error is overruled.

*Second Assignment of Error*

**{¶47}** Elliott argues that his convictions for the four firearm specifications under R.C. 2941.141(A) and his conviction for having weapons while under a disability in violation of R.C. 2923.13(A)(3) are against the manifest weight of the evidence.

Legal Standard

**{¶48}** We herein reincorporate the legal standard for the manifest weight of the evidence analysis as set forth under the first assignment of error. Further, "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins, supra*, 78 Ohio St.3d at 386. However, "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a

finding of sufficiency." *State v. Roberts*, 9th Dist. Lorain No. 96CA006462, 1997 WL 600699, *2 (Sept. 17, 1997). *See also State v. Malone*, 3d Dist. Marion No. 9-06-43, 2007-Ohio-5484, ¶ 33, citing *State v. Conklin*, 2d Dist. Darke No. 1556, 2002-Ohio-2156, (holding, in a case where an appellant raised a manifest weight challenge, that a court can examine the sufficiency of the evidence supporting a conviction pursuant to Civ.R. 52(B)); *State v. Beard*, 6th Dist. Wood No. WD-08-037, 2009-Ohio-4412, ¶ 14; *State v. Noernberg*, 8th Dist. Cuyahoga No. 97126, 2012-Ohio-2062, ¶ 31.

{¶49} "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins, supra*, 78 Ohio St.3d at 387. An analysis of the sufficiency of the evidence "addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

{¶50} "An appellate court is not to examine whether the evidence presented should be believed but should rather 'examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 57 (3d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds*,

*State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668 (1997). The

applicable standard of review

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State*

*v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

Legal Analysis

**{¶51}** *Four Convictions for One-Year Firearm Specifications*: To prove a

one-year firearm specification pursuant to R.C. 2941.141(A), the State must

establish "that the offender had a firearm on or about the offender's person or under

the offender's control while committing the offense." R.C. 2941.141(A). The

Revised Code defines a "firearm" as follows:

> **(B)(1) 'Firearm' means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.**
>
> **(2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.**

R.C. 2923.11(B). Thus, to support a firearm specification, the State must not only

establish that a firearm existed but also "must prove beyond a reasonable doubt that

-30-

the firearm was operable or could readily have been rendered operable at the time of the offense." *State v. Staten*, 10th Dist. Franklin No. 18AP-48, 2018-Ohio-4681, ¶ 11, quoting *State v. Murphy*, 49 Ohio St.3d 206, 208, 551 N.E.2d 932 (1990), syllabus. *See State v. Gaines*, 46 Ohio St.3d 65, 69, 545 N.E.2d 68, 72 (1989) ("[T]here must be some evidence relative to the gun's operability.")

**{¶52}** To establish a firearm specification, "the state need not produce the actual firearm." *Staten* at ¶ 11. Circumstantial evidence may be used to "prove that the firearm existed *and* that it was operable at the time of the offense." (Emphasis added.) *State v. Jackson*, 169 Ohio App.3d 440, 2006-Ohio-6059, 863 N.E.2d 223, ¶ 26-27 (6th Dist.), citing *Thompkins, supra*, 78 Ohio St.3d at 385. *See State v. Knight*, 2d Dist. Greene No. 2003 CA 14, 2004-Ohio-1941, ¶ 19 (holding that "both a weapon's existence and its operability may be inferred from the facts and circumstances" of a case). *See also State v. Pope*, 1st Dist. Hamilton No. C-180587, 2019-Ohio-3599, ¶ 7 ("Operability of a firearm may be established by an operability report or testimony of a witness who had test-fired the weapon, but it also may be established by circumstantial evidence.").

**{¶53}** The State may establish that a firearm was operable "by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *In re C.M.*, 3d Dist. Allen No. 1-21-31, 2022-Ohio-240, ¶ 40, quoting *Murphy* at syllabus.

> **This may include, for example, testimony that a gunshot was heard or that shell casings or bullet holes were found. It also may include evidence that can be viewed as an acknowledgement by the individual exercising control over the firearm that it was operable, through testimony about how he used the gun, his statements, and his conduct.**

*State v. Brooks*, 8th Dist. Cuyahoga No. 71155, 1997 WL 218417, *4 (May 1, 1997), quoting *Tilley v. McMackin*, 989 F.3d 222, 225 (6th Cir. 1993) (examining operability under R.C. 2923.11(B)).

{¶54} Further, "under R.C. 2923.11(B)(2), in determining whether or not a firearm is operable, the trier of fact may rely upon * * * the representations and actions of the individual exercising control over the firearm." *State v. Haas*, 11th Dist. Portage No. 2009-P-0068, 2010-Ohio-6249, ¶ 42. This "include[s] explicit or implicit threats made by the person in control of the firearm." *State v. Stokes*, 2d Dist. Clark No. 2020-CA-57 and 2021-CA-18, 2021-Ohio-3616, ¶ 36.

> **[W]here an individual brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable.**

*Thompkins, supra*, 78 Ohio St.3d at 384. We turn to examining the evidence that is relevant to the one-year firearm specifications.

{¶55} In this case, the four firearm specifications were charged with a count of menacing by stalking; a count of felonious assault; a count of rape; and the count of intimidation of an attorney, victim, or witness in a criminal case. Doc. 2. These

four underlying charges were alleged to have occurred on the night of August 23-24, 2020 with J.F. as the alleged victim of these four offenses. Doc. 2. The appellant argues "the evidence relating to guns * * * did not support" the firearm specifications. Appellant's Brief, 20. In particular, the parties, in their briefs, dispute whether the evidence establishes that Elliott had a firearm on August 23-24, 2020. To resolve this dispute in this case, we must determine if the evidence in the record establishes that Elliott had an *operable* gun on or about his person. *State v. Hampton*, 1st Dist. Hamilton No. 2002-Ohio-1907, 2002 WL 507330, *4 (Apr. 5, 2002) ("Under Ohio law, a firearm is defined by its operability.").

{¶56} At trial, J.F. did not provide any testimony that would tend to establish any of the elements for any of the one-year firearm specifications charged against Elliott. Rather, it was primarily Officer Peterson who provided the testimony that was relevant to the four firearm specifications in this case. Tr. 202. In his trial testimony, Officer Peterson relayed what J.F. had told him at the hospital just after the incident on August 23-24, 2020. Tr. 199. He described her demeanor at the time that she was speaking with him, saying that J.F. "was extremely upset, kind of distraught, and was crying * * *." Tr. 200. He then testified that J.F. said that the following occurred after she had been sexually assaulted:

> * * * [W]hen she woke up, came to, Michael [Elliott] was staring at her. She went to stand up and as she stood Michael approached her and knocked her back down and told her to pick the stuff up off the floor from her purse.

\* \* \*

> **She asked to leave, said she had to go to the hospital for the injuries that had been caused. He would not let her leave. He had her keys. She said it was prescription pills and money that \* \* \* he refused to give back to her. She observed him carrying shotguns out of the room and possibly a handgun. As she walked out, she was able to get her keys. She said she was going to the hospital to tell them what happened. He explained that if she went to the hospital and told on what had occurred that night that he was going to burn her house down with her inside of it.**

Tr. 202-203.[6] Officer Peterson then reiterated that J.F. indicated that Elliott had "a handgun and two shotguns." Tr. 213.

{¶57} Further, at trial, A.Y. testified that, while she and Elliott were still living together, he "bought a gun from a friend" in "mid March, late March" of 2020. Tr. 379. She also stated that Elliott "was trying to build them [guns] too." Tr. 379. The only description that she had of the gun that Elliott purchased was the following: "[i]t was a bigger gun, like a regular type." Tr. 380. The testimony at trial indicates that A.Y. had lived in the apartment with Elliott where the incident with J.F. occurred. Tr. 379. *See* Tr. 515. While A.Y.'s testimony does not address whether Elliott had weapons "on or about" his person on the night of August 23-24, 2020, her statements do provide some corroboration to J.F.'s assertion that she saw guns in Elliott's apartment.

---

[6] The Defense did not challenge the admissibility of these statements at trial or in this appeal. Tr. 202-203.

{¶58} J.F.'s statements to Officer Peterson are sufficient to establish that Elliott was in possession of what appeared to be "a handgun and two shotguns." Tr. 213. However, J.F.'s statements do not contain any circumstantial evidence that would indicate that Elliott was in possession of guns that were *operable*. *See State v. Cunningham*, 8th Dist. Cuyahoga No. 48558, 1985 WL 7489, *4 (Jan. 31, 1985) (holding that "proof that an object is a gun does not demonstrate that it is a firearm within the statutory definition"); *State v. Johnson*, 9th Dist. Lorain No. 14CA010688, 2016-Ohio-872, ¶ 13 (holding that "merely naming the weapons has been held to be insufficient to demonstrate operability").

{¶59} J.F. did not indicate to Officer Peterson that Elliott expressly threatened her with the gun. *See State v. Cameron*, 12th Dist. Warren No. CA93-03-028, 1993 WL 489733, *2 (Nov. 29, 1993) (holding that "[t]he fact that the offender had what appeared to be a gun and verbally threatened to shoot the victim is sufficient circumstantial evidence of operability"). Officer Peterson testified that J.F. had told him that Elliott threatened to burn down her house if she reported him to the police. *See State v. Chapman*, 12th Dist. Butler No. CA2018-03-046, 2018-Ohio-4560, ¶ 28 (finding operability was not established where the defendant struck the victim with a gun but did not otherwise "treat the gun as if it were operable"). However, these statements do not draw any connection between this threat and any guns that Elliott may have had. In fact, his threat was completely unrelated to guns.

No inference about the operability of any guns that Elliott may have had on or about his person can be drawn from the content of this threat.

**{¶60}** J.F.'s statements to Officer Peterson also did not contain any indication that Elliott used the guns in a manner that was implicitly threatening. She did not indicate that Elliott brandished the gun or pointed the gun at her. *State v. Hills*, 8th Dist. Cuyahoga No. 98848, 2013-Ohio-2902, ¶ 16 ("The word 'brandish' means to 'wave or exhibit in a menacing or challenging manner.'"), quoting *State v. McCrary*, 1st Dist. Hamilton No. C-08060, 2009-Ohio-4390, ¶ 30; *State McDade*, 11th Dist. Lake No. 97-L-059, 1998 WL 682360, *12 (Sept. 25, 1998) ("[T]he implicit threat of simply brandishing a firearm during the commission of a felony constitutes sufficient evidence of operability * * *."); *State v. Brown*, 8th Dist. Cuyahoga No. 106667, 2019-Ohio-313, ¶ 28 (concluding that the act of holding a gun to the victim's head was evidence of operability).

**{¶61}** We note that "[n]umerous cases support a conviction if the defendant states he has a gun and will use it, even if no one sees the gun and the gun is never produced at trial and therefore cannot be tested to determine whether it is operable." *State v. Watkins*, 8th Dist. Cuyahoga No. 84288, 2004-Ohio-6908, ¶ 16. But when a defendant "states [that] he has a gun and [that he] will use it," he is making a representation about the existence of a gun *and* the operability of that gun. *Id*. From such a statement, a reasonable trier of fact can infer both the existence and the operability of a gun. *See State v. Cameron*, 12th Dist. Warren No. CA93-03-028,

1993 WL 489733, *2 (Nov. 29, 1993) (a trier of fact may "draw multiple inferences from a single fact or set of facts * * *.").

**{¶62}** However, J.F. only told Officer Peterson that she observed Elliott "carrying shotguns *out* of the room * * *." (Emphasis added.) Tr. 213. Thus, the testimony at trial establishes one action that Elliott undertook with respect to the guns that J.F. observed in his possession: Elliott removed these guns from the room in which J.F. was located. This behavior does not "imply that his gun was in fact operable * * *." *State v. Crawford*, 8th Dist. Cuyahoga No. 82833, 2004-Ohio-500, ¶ 37. *See also State v. Ihinger*, 5th Dist. Muskingum, 2019-Ohio-1881, ¶ 12. While J.F.'s statement to Officer Peterson about Elliott "carrying shotguns out of the room and possibly a handgun" supports the conclusion that Elliott saw what appeared to be guns, this statement does not relay any information that could also support an inference that the guns were operable. Tr. 202-203. We turn now to examining whether the items recovered in a search of the premises where Elliott lived can establish operability.

**{¶63}** Officer Peterson testified that, after taking J.F.'s report on August 24, 2020, the police went to where Elliott lived and searched his apartment. Tr. 207. The testimony at trial indicates that Elliott lives on his mother's property in an apartment above a garage. Tr. 208-209. This apartment and garage constitutes a structure that stands next to the main residence on property where Elliott's mother lives. Tr. 208-209. Officer Peterson testified that, during the search of the structure

in which Elliott's apartment was located, the police did not locate a shotgun, a rifle, or a handgun. Tr. 213. Thus, the police did not find any guns that could be tested for operability or admitted into evidence at trial. *See State v. Hunter*, 9th Dist. Medina No. 17CA0069-M, 2018-Ohio-4249, ¶ 8.

**{¶64}** However, Officer Peterson testified that the police did recover a pellet gun, a few gun parts, and ammunition during a search of the property where Elliott lived. Tr. 207-209, 214. We will now examine whether any of these three classes of discoveries can establish the operability of the guns that J.F. observed Elliott carrying on August 23-24, 2020. First, at trial, Officer Peterson testified that the police located a "pellet gun that was inside the residence of where it [the incident] took place." Tr. 207-208. He further stated that this pellet gun was "an air soft pistol * * * that resembled a handgun." Tr. 208. However, Officer Peterson testified correctly at trial that a pellet gun is not a firearm. Tr. 208. *See Matter of M.L.S.*, 7th Dist. Harrison No. 21 HA 0010, 2022-Ohio-2195, fn. 2, citing *State v. Hanning*, 89 Ohio St.3d 86, 90, 2000-Ohio-436, 728 N.E.2d 1059, 1063 (2000). This discovery cannot establish a conviction for a one-year firearm specification and does not tend to establish that Elliott had an operable gun in his possession.

**{¶65}** Second, the police located "pieces of a weapon that was taken apart," such as "a barrel" and "a trigger." Tr. 208. But there was no testimony at trial that indicates that these random assortment of parts were capable of being assembled and rendered into a readily operable firearm. Tr. 208. *See State v. Green*, 7th Dist.

-38-

Mahoning No. 91 C.A. 49, 1992 WL 112546, *2-3 (May 20, 1992) (considering testimony about what would have made a gun readily operable). Further, the discovery of these gun parts does not make it more likely that any guns seen by J.F. in the apartment were operable.

{¶66} Third, Officer Peterson testified that the police discovered ammunition in a garage under Elliott's apartment.[7] Tr. 207. He stated that the ammunition was "for a .22 long rifle" and for a shotgun. Tr. 209. Ex. 10. Ohio courts have found circumstantial evidence of operability where ammunition is discovered loaded into a gun or alongside a gun that is capable of firing it. *See Pope, supra*, at ¶ 10; *State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 13; *State v. Smith*, 4th Dist. Pickaway No. 19CA33, 2021-Ohio-2866, ¶ 58-62; *State v. Tillman*, 6th Dist. Fulton No. F-11-006, 2012-Ohio-5265, ¶ 15; *State v. Hunter*, 9th Dist. Medina No. 17CA0069-M, 2018-Ohio-4249, ¶ 8; *State v. Dickerson*, 11th Dist. Ashtabula No. 2013-A-0046, 2015-Ohio-938, ¶ 36 ("Evidence that a gun was loaded [at the time of discovery] combined with the submission of that gun into evidence is sufficient to prove operability."); *State v. Miller*, 12th Dist. Preble No. CA2002-02-004, 2002-Ohio-6109, ¶ 13-14.

---

[7] Officer Peterson stated that "[w]e found ammunition in the home * * *." Tr. 208. However, based on context of the statement, "home" appears to refer to the structure that contained both the garage and Elliott's apartment because Officer Peterson then specifically testified that ammunition was located in the garage. Tr. 208-209. Ex. 10.

{¶67} However, in the case presently before this Court, the ammunition was not found loaded into any gun or alongside any gun. As Officer Peterson's testimony indicates, no guns were found anywhere in proximity to this ammunition. But even beyond the fact that no guns were recovered in this case, there is also no evidence that indicates J.F. could determine that the guns were loaded; observed Elliott loading the guns; saw Elliott with ammunition on his person; or saw readily accessible ammunition alongside the gun. Again, there was no information reported by J.F. that would indicate that Elliott was acting in a manner that would suggest that these particular guns were operable at that time. *See State v. Ratliffe*, 8th Dist. Cuyahoga No. 35299, 1976 WL 191159, *2 (Dec. 9, 1976). *See also State v. Smith*, 2d Dist. Montgomery No. 21049, 2006-Ohio-4163, ¶ 34.

{¶68} Further, we also note that Elliott lived on a property owned by his mother. Tr. 208-209. His apartment was located above a two-car garage in a structure next to his mother's residence. Tr. 516. The State did not present any evidence at trial that established who used or had access to the garage. *State v. Struckman*, 1st Dist. Hamilton No. C-180287, 2020-Ohio-1232, ¶ 17; *State v. Burton*, 8th Dist. Cuyahoga No. 107054, 2019-Ohio-2431, ¶ 3, 49. The testimony at trial does not establish that the garage was directly accessible from the second-story apartment. Officer Peterson only stated that the lower level of the structure "had a side door with a garage door," indicating that the garage was accessible from

the outside. Tr. 209. Other testimony at trial seems to indicate that the second-story apartment had an external staircase that went down to the street. Tr. 516-518.

**{¶69}** Having examined the evidence in the record, we conclude that the State did not present sufficient evidence that establishes, beyond a reasonable doubt, that any guns on or about Elliott's person on the night of August 23-24, 2020 were operable. There was some evidence that Elliott may have been in possession of guns on the night of August 23, 2020. "But the mere possession of a gun, without something more, is not enough to allow for a finding that it is operable." *In re S.D.*, 1st Dist. Hamilton Nos. C-180651, C-180652, C-180653, C-190011, 2020-Ohio-941, ¶ 11, citing *Chapman, supra*, at ¶ 28.

**{¶70}** Further, beyond containing no indication that the guns observed by J.F. were operable, the facts presented at trial and examined in this analysis also do not contain any indication that these guns were capable of being readily rendered operable. In the absence of evidence that indicates any of these guns were operable or capable of being readily rendered operable, the four convictions for the one-year firearm specifications are not supported by legally sufficient evidence. For this reason, we must reverse the four convictions for the one-year gun specifications.

**{¶71}** *Having Weapons While Under Disability Conviction*: The State establishes that a defendant committed the crime of having weapons while under disability in violation of R.C. 2923.13(A)(3) by proving that the defendant "has been convicted of any felony offense involving the illegal possession, use, sale,

-41-

administration, distribution, or trafficking in any drug of abuse * * *" and "knowingly acquire[d], ha[d], carr[ied], or use[d] any firearm * * *." R.C. 2923.13(A)(3).[8] We reincorporate the definition of "firearm" from R.C. 2923.11(B) as quoted in our analysis of the four one-year firearm specifications. Thus, as with the one-year firearm specifications, the State had to establish, beyond a reasonable doubt, that any gun that Elliott had while under disability was operable or was capable of being readily rendered operable.

{¶72} In this case, the indictment alleged that Elliott had weapons under disability on or about August 23, 2020. Doc. 2, 57. This was the night that J.F. reported Elliott. Thus, the evidence that was presented for the weapons under disability charge at trial was the same as the evidence presented for the four one-year firearm specifications. After examining the evidence in our analysis of the one-year firearm specifications, we concluded that the State did not establish that any guns on or about Elliott's person on August 23, 2020 were operable. Doc. 2, 57. For the same reasons, we also conclude that the State did not establish the operability of any guns that Elliott had on August 23, 2020 for the weapons under disability charge.

---

[8] R.C. 2923.13(A)(3) also contains a prohibition against dangerous ordnances. R.C. 2923.13(A)(3). However, the State did not argue that Elliott violated R.C. 2923.13(A)(3) by having a dangerous ordnance under disability. *See* Tr. 477. Further, none of the evidence presented at trial would suggest that Elliott had a dangerous ordnance as defined by R.C. 2923.11(K)-(L).

{¶73} In conclusion, the State had the burden of establishing that any guns that Elliott may have had on the night of August 23-24, 2020 were operable. Having examined the evidence in the record, we have discovered no evidence that would establish, beyond a reasonable doubt, that any such guns were operable. For this reason, we must also reverse the conviction for having weapons under disability. The second assignment of error is sustained.

*Third Assignment of Error*

{¶74} Elliott raises several arguments that challenge the constitutionality of the sentencing scheme prescribed in R.C. 2967.271. However, he admits in his brief that he did not raise these arguments before the trial court. Appellant's Brief, 24. For this reason, we will set forth and apply the plain error standard of review.

Legal Standard

{¶75} Under the Ohio Rules of Criminal Procedure, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> **"In order to find plain error under Crim.R. 52(B), there must be an error, the error must be an 'obvious' defect in the trial proceedings, and the error must have affected 'substantial rights.'"** *State v. Bowsher*, **3d Dist. Union No. 14-07-32, 2009-Ohio-6524, ¶ 12, quoting** *State v. Barnes*, **94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). 'The standard for plain error is whether, but for the error, the outcome of the proceeding clearly would have been otherwise.'** *State v. Hornbeck*, **155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing** *State v. Long*, **53 Ohio St.2d 91, 372 N.E.2d 804 (1978). Notice of plain error is taken "only to 'prevent a manifest miscarriage of justice.'"** *State*

> **_v. Davis_, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 23, quoting _Long, supra_, at paragraph three of the syllabus.**

_State v. Eitzman_, 3d Dist. Henry No. 7-21-03, 2022-Ohio-574, ¶ 42, quoting _State v. Taflinger,_ 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 17.  Under Crim.R. 52(B), "the _defendant_ bears the burden of demonstrating that a plain error affected his substantial rights."  (Emphasis sic.)  _State v. Perry_, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

Legal Analysis

{¶76} Elliott raises five main arguments against the Reagan Tokes Law. First, as a preliminary matter, Elliott asserts that the arguments that he has raised to challenge the Reagan Tokes Law are ripe for review.  After Elliott filed his appellate brief, the Ohio Supreme Court held that "a challenge to the constitutionality of R.C. 2967.271 [the Reagan Tokes Law] is ripe for review * * *" in _State v. Maddox_, --- Ohio St.3d ---, 2022-Ohio-764, --- N.E.3d ---, ¶ 22.  _See State v. Ball_, 3d Dist. Allen No. 1-21-16, 2022-Ohio-1549, ¶ 61.  Accordingly, we will address each of the constitutional arguments raised by Elliott in this appeal.

{¶77} Second, Elliott argues that the Reagan Tokes Law is in violation of the right to a trial by jury.  However, in _State v. Ball_, this Court upheld the constitutionality of the Reagan Tokes Law against this exact same challenge.  _Ball_ at ¶ 63.  _See also State v. Freeman_, 3d Dist. Allen Nos. 1-21-17, 1-21-18, 2022-Ohio-1991, ¶ 13; _State v. Davis_, 3d Dist. Auglaize No. 2-21-10, 2022-Ohio-1900, ¶

11-13. At this time we decline to revisit our prior precedent and herein apply our holding in *Ball* to the case before us. *Ball* at ¶ 63, citing *State v. Thompson*, 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027, ¶ 24; *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 46 (8th Dist.) (en banc); *State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282, ¶ 20. Thus, this challenge is without merit.

**{¶78}** Third, Elliott argues that the Reagan Tokes Law violates the separation of powers. However, in *State v. Hacker*, this Court considered this challenge and concluded that this provision does not run afoul of the separation of powers. *State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112, ¶ 22 (3d Dist.).[9] We decline at this time to revisit our prior precedent and herein apply our holding in *Hacker* to the case before us. *Id. See also State v. Barnes,* 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 36; *State v. Bontrager*, 4th Dist. Adams No. 21CA1139, 2022-Ohio-1367, ¶ 44; *State v. Maddox*, 5th Dist. Lucas No. L-19-1253, 2022-Ohio-1350, ¶ 7. Thus, this challenge is without merit.

**{¶79}** Fourth, Elliott argues that the Reagan Tokes Law is void for vagueness because this provision does not specifically state the infractions that may serve as the basis for keeping an offender beyond his or her presumptive release date. *See State v. Parker*, 8th Dist. Cuyahoga No. 109494, 2022-Ohio-1164, ¶ 15. "The vagueness doctrine, which is premised on due process concerns, requires that

---

[9] We are aware that the Ohio Supreme Court accepted an appeal of *State v. Hacker* on March 2, 2021. *State v. Hacker*, 161 Ohio St.3d 1449, 2021-Ohio-534, 163 N.E.3d 585. However, the Ohio Supreme Court has not yet rendered a decision in that appeal.

statutes give 'fair notice of offending conduct.'" *State v. Kinstle*, 2012-Ohio-5952,

985 N.E.2d 184, ¶ 20 (3d Dist.), quoting *State v. Lewis*, 131 Ohio App.3d 229, 235,

722 N.E.2d 147 (3d Dist. 1999).

> **The critical question in all cases as to void for vagueness is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable the person to conform their conduct to the law.**

*State v. Davis*, 2021-Ohio-3093, 177 N.E.3d 320, ¶ 17 (5th Dist.). In this analysis,

"legislative enactments must be afforded a strong presumption of constitutionality."

*State v. Collier*, 62 Ohio St.3d 267, 269, 581 N.E.2d 552 (1991). The party

challenging the constitutionality of a law bears the burden of establishing its

unconstitutionality. *State v. Thompkins*, 75 Ohio St.3d 558, 560, 1996-Ohio-264,

664 N.E.2d 926 (1996).

**{¶80}** We recently considered this exact argument in *State v. Morrissey*, 3d

Dist. Hardin No. 6-22-06, 2022-Ohio-3519, ¶ 19, where we held the following:

> **The Reagan Tokes Law states the factors that are to be considered in determining whether to keep an inmate beyond his or her presumptive release date. R.C. 2967.271(C)(1). These factors include consideration of whether the inmate has committed certain 'institutional rule infractions.' R.C. 2967.271(C)(1)(a). The institutional rule infractions refer to the inmate rules of conduct that are set forth in Ohio Adm. Code 5120-9-06. *State v. Compton*, 2d Dist. Montgomery No. 28912, 2021-Ohio-1513, ¶ 15, quoting *State v. Simmons*, 2021-Ohio-939, 169 N.E.3d 728, ¶ 21 (8th Dist.). *See also* Ohio Adm. Code 5120-9-08(M)(3).**
>
> **We agree with the other courts that have held the institutional rules set forth in the administrative code are sufficient to provide inmates with 'adequate notice of the conduct that will lead to rule**

**infractions * * *.'** *Compton* **at ¶ 15, quoting** *Simmons* **at ¶ 21 (considering whether inmates have adequate notice of what conduct may lead to being kept beyond a presumptive release date but in the context of a procedural due process challenge to the Reagan Tokes Law). These inmate rules of conduct do not need to be replicated verbatim in the text of the Reagan Tokes Law for inmates to be aware of the conduct that may lead to being kept beyond a presumptive release date.**

*Morrissey* at ¶ 20-21. We decline to revisit our prior decision at this time. Thus, Elliott has not, with this argument, established that the Reagan Tokes Law is unconstitutionally vague. This challenge is without merit.

{¶81} Fifth, Elliott argues that the text of the Reagan Tokes Law does not contain adequate due process protections. However, this Court considered this issue in *State v. Hacker* and found that the Reagan Tokes Law was not unconstitutional on due process grounds. *Hacker, supra*, at ¶ 18-23. Again, we decline to revisit our prior precedent and herein apply our holding in *Hacker* to the case before us. *Id.* *See also State v. Jinks*, 2d Dist. Montgomery No. 29155, 2022-Ohio-282, ¶ 19; *State v. Ratliff*, 5th Dist. Guernsey No. 21CA000016, 2022-Ohio-1372, ¶ 51; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 17. Thus, this challenge is without merit.

{¶82} Having examined these arguments, we conclude that none of the five challenges raised by Elliott in this appeal establish that the Reagan Tokes Law is sufficient to overcome the presumption of constitutionality that is afforded to

legislative enactments. Thus, Elliott has not carried the burden of establishing plain error. Accordingly, his third assignment of error is overruled.

*Conclusion*

**{¶83}** Having found no error prejudicial to the appellant in the particulars assigned and argued in the first and third assignments of error, the judgment of Logan County Court of Common Pleas is affirmed as to these issues. Having found error prejudicial to the appellant in the particulars assigned and argued in the second assignment of error, the judgment of the Logan County Court of Common Pleas is reversed as to these issues. This case is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**MILLER and SHAW, J.J., concur.**

**/hls**